## COUNTY COMMISSIONERS OF ANNE ARUNDEL COUNTY' *vs.* STATE OF MARYLAND, use of MATILDA STANSBURY et al.

*Contributory Negligence of Traveller Falling Through Open Draw of a Bridge—Evidence— Opinion of Witness.*

It is the duty of a person driving across a draw-bridge to look and listen in order to ascertain if the draw is open, and if he falls through an open draw which he would have known to be open if he had looked and listened to the signals and sounds indicating that it was open, he is guilty of contributory negligence.

A man driving at night in a buggy started across a bridge over a river. There was a swing draw in the middle of the bridge, and when this was open for the passage of boats, two green lights were shown at the entrance of the draw and three red lights appeared on that part of the bridge swung open, transverse to the road-way. When the draw was closed, all these lights appeared in a line with the length of the bridge. When the driver approached the draw it had been opened for a boat which had then nearly passed through, and the lights were clearly visible which showed that the draw was open. Shortly before that, the whistle of the boat calling for the opening of the draw had been sounded, and as it passed through, while the driver was coming near, a loud exhaust sound was made by the engine of the vessel. The driver was well acquainted with the bridge and the arrangement of the lights, and in possession of sight and hearing, but he drove into the open draw and was drowned. If he had looked when he drove on the bridge, or afterwards, he must have seen that the position of the red lights indicated that the draw was open. If he had listened, he must have heard the whistle of the boat and the noise of the exhaust. No chain or rail was placed across the opening. In an action to recover damages for the death so occasioned, *held*, that the driver's own negligence was the cause of his death and there can be no recovery therefor in this action.

In an action against a county for the death of the plaintiff's deceased, caused by his falling into the open draw of the bridge he was crossing, evidence of the opinion of a witness as to what was necessary to make the bridge safe when the draw was open, is not admissible, when it is not shown that the witness possessed any special knowledge of the matter, and when the probable result of the absence of a barrier at the open draw could be determined by the jury as well as by the witness.

*Decided January 8th, 1908.*

Appeal from the Circuit Court for Baltimore County,. (DUNCAN, J.) where there was a verdict for the plaintiffs for $3,500.

*Plaintiff's 1st Prayer.*—If the jury find that the bridge mentioned in the declaration in this case, was on, and a part of, one of the public roads of Anne Arundel County, that it spans the Severn river in said county; that the bridge was constructed with a draw so arranged as to allow vessels to pass through, that when the draw was turned so as to allow vessels to pass a space was left between the sides of the draw and the ends of the bridge next thereto wide enough to allow vehicles passing over said bridge to fall therein, then it became and was the duty of the defendants, the County Commissioners of Anne Arundel County, whenever said draw was thus open to place sufficient safe guards at or over the draw of said bridge, so as to give proper and timely warning to persons driving along and over said bridge at such times that said draw was open, that they might avoid the danger of driving into the same; and if they find, that on or about the twenty-eighth day of September, 1906, James Stansbury the husband and father of the equitable plaintiffs, while driving along and over said bridge, and using due care drove into the said draw and was drowned because of the neglect of said duty on the part of the defendant, then their verdict should be for the plaintiffs.    (*Granted.*)

*Plaintiff's 2nd Prayer.*—The jury are instructed that negligence on the part of the deceased James Stansbury is not to be presumed, but the burden of proving the same to the satisfaction of the jury, rests upon the defendant.    (*Granted.*)

*Plaintiff's 3rd Prayer.*—If the jury find for the plaintiff, then in assessing the damages they are to estimate the reasonable probabilities of the life of the deceased Stansbury and give to his widow and children the equitable plaintiffs such pecuniary damages not only for past losses but for such prospective damages as the jury may find they have suffered or will suffer as the direct consequence of the death of the said

Stansbury and that in awarding the damages to which the plaintiff is entitled, they must apportion the same among the equitable plaintiffs in such shares respective as they find and direct.  (*Granted.*)

*Defendants' 1st Prayer.*—The jury are instructed that upon the uncontradicted facts in this case there is no evidence legally sufficient upon which the plaintiffs can recover and their verdict must be for the defendants.   (*Refused.*)

*Defendants' 2nd Prayer.*—The jury are instructed that the uncontradicted facts in this case show that the deceased directly contributed to his death and the verdict of the jury must be for the defendants.   (*Refused.*)

*Defendants' 3rd Prayer.*—That the plaintiffs can not recover in this case if the jury believe from the evidence that there was any want of ordinary care on the part of deceased contributive to produce the injury complained of.   (*Refused.*)

*Defendants' 4th Prayer.*—That according to the uncontradicted facts in this case the bridge in question was supplied with reasonable lights to warn the travelling public of the existence of the draw in the bridge over the Severn river where the accident occurred and that said lights were in good condition and burning on the night of the accident and that the night itself was not too dark for anyone approaching the draw to discern it; and if the jury find that the said deceased was accustomed to travel said bridge by night as well as by day and the existence of the draw was known to him and he was familiar with the lights and the jury shall further find that the deceased drove on the night referred to, from the bridge into the open draw and lost his life in consequence thereof, then the plaintiffs in this case are not entitled to recover.  (*Granted.*)

*Defendants' 5th Prayer.*—And if the jury find that the said deceased was accustomed to travel said bridge by night as well as by day and the existence of the draw was known to him and he was familiar with the lights; and if the jury shall further find that the deceased on the night referred to drove from the bridge into the open draw and lost his life in consequence thereof, then the plaintiffs in this case are not entitled to recover.  (*Granted.*)

*Defendants' 6th Prayer.*—The plaintiffs cannot recover in this action without showing that the defendants or its agents were guilty of negligence in the construction and management of the bridge and draw referred to in the evidence and that the injury to deceased was caused by said negligence and the burden of proof is on the plaintiffs to prove such negligence and that the death of deceased was caused thereby. (*Granted.*)

*Defendants' 7th Prayer.*—If the jury find that the deceased, James Stansbury, was accustomed to cross the Severn river going backwards and forwards from his home to Annapolis by the bridge over said river containing a draw in the same, and was familiar with the signal lights on the draw, and when he approached said draw on the evening of the 28th Sept., 1906, it was light enough for him to see that the draw was open, and if they further find that the lights displayed on the draw as described in the evidence showed that the draw was open as said deceased approached the same, and if the jury find that said deceased disregarding the signals drove into the open draw then the plaintiffs can not recover and the verdict of the jury must be for the defendants. (*Granted.*)

The cause was argued before Boyd, C. J., Briscoe, Pearce, Schmucker, Burke and Rogers, JJ.

*James W. Owens* and *D. G. McIntosh,* for the appellants.

*Robert Moss* and *Jesse Slingluff* (with whom were *Jerry L. Smith* and *John Grason* on the brief), for the appellees.

Pearce, J., delivered the opinion of the Court.

This action was brought by the State for the use of the widow and children of James Stansbury to recover damages for his death alleged to have been caused by the negligence of the Commissioners of Anne Arundel County. On September 28th, 1906, the deceased was driving in a buggy drawn by a single horse, from the city of Annapolis to his home in the country, and between seven and eight o'clock in the evening he drove upon the Severn river bridge connecting the two

shores of that river and forming a part of one of the highways of Anne Arundel County. In this bridge there is a swing draw, which was open at the time of the accident resulting in Stansbury's death, to admit the passage of a ten ton bugeye propelled by a gasoline engine, and just after this vessel had cleared the draw Stansbury drove off the end of the bridge into the opening and was drowned. The negligence of the defendant, as stated in the *nar.* consisted in allowing the draw "while so opened, to remain unguarded either by its servants or agents to warn travellers of the danger, and to so remain open without guards, chains, ropes, lights, or any notice of any kind, that the draw of said bridge was open." There were no chains or barriers to close the opening made when the draw was open, but the bridge was equipped with five large lights, described by the bridge keeper as marine lights, such as are used by the Federal Government, all of which were burning brightly at the time of the accident. Two of these lights were green, and three were red. The two green lights are located on the bridge proper, one on each side of draw, just where it connects with the bridge. The draw turns upon a pivot, and when it revolves, the lights upon it also revolve. When the draw is closed, a traveller crossing the bridge, and approaching the draw from either end, has before him all these lights in a line with the length of the bridge, and a vessel approaching the draw when closed has before it all these lights in a line transverse to its line of approach. Thus the traveller on the bridge—and those in charge of an approaching vessel, familiar with the use of the bridge and river, are both informed that the draw is closed.

When the draw is fully open the traveller on the bridge has before him a single green light on the bridge upon the side of the draw he is approaching, and the three red lights of the draw at right angles to his line of approach; and a vessel approaching has before it, the two green lights marking either end of the open span and the line of the bridge, and the three red lights of the draw, in the line of its approach to the bridge and thus both the traveller and the vessel are informed that

the draw is open. · If the draw is being opened, but not fully open, the rotary motion of the end red lamps on the draw, indicate both to the traveller and the vessel that the draw is in motion.    It would seem to be difficult to provide a simpler or more efficient system of lighting for the safety both of travellers on the bridge and vessels passing through the draw.

The bridge keeper testified that at the time of the accident the moon was shining, but the night was a little hazy, and that one could see a good distance, from 150 to 200 yards, that all the appliances for working the draw were in proper condition, and all the lights burning as brightly as they could burn.    He said that upon hearing the whistle of a boat for the draw, he started to go from his house on the bridge near the Annapolis shore to help the night keeper open the draw, but hearing him talking with some one, he concluded he already had assistance; that just at that time a man driving in a buggy passed him on the bridge, driving in a trot towards the draw, that he himself continued to walk towards the draw after this man passed him and that while yet some distance from the draw, he "saw the buggy stop, and then it went over, just·like that."

The night keeper of the bridge testified that he opened the draw when the bugeye blew its whistle, being assisted by Mr. Owens, and that the vessel passed through; that he started to turn the draw back and when he made about three turns of the crank he heard a noise, and asked Owens what that was and Owens said somebody's horse and buggy went overboard.

Owens testified that he and the keeper were closing the draw and when they had made about three turns, "while I was going around, I saw the team come up and stop, and when I was going around again the team was going over board."

The evidence is that Stansbury was perfectly familiar with the bridge, and was in the habit of using it by night as well as by day, in going to and from his work at the Naval Academy and in bringing his employer, Mr. Walls, from Fort Madison to his home at Annapolis, and the night keeper said he had

seen him on the bridge when the draw was open waiting near the draw, "like other people for the draw to close."

During the examination in chief of Mr. Arnold, a witness for plaintiff, and a former keeper of this bridge, he was asked "what was there to guard a traveller from going in?" and he replied "only five lights." He was then asked, "what in your judgment was necessary there to safe guard that bridge when the draw was open in the night?" This was objected to but the objection was overruled and he replied, "Well sir, I think a chain, pole, or most anything like that would have done," and this constitutes the first exception.

In *Hill* v. *R. R. Co.*, 55 Maine 438, a witness was asked whether the blowing of a whistle, in the circumstances in evidence was safe and prudent, and the question was held improper "since it asked for a mere naked expression of opinion as to the character and quality of acts open to common observation."

In *Turnpike Co.* v. *Leonhardt*, 66 Md. 77, it is said, "It is proper to lay before the jury all the facts which are necessary to enable them to form a judgment on the matters in controversy; and when the subject under investigation required special skill and knowledge, they may be aided by the opinions of persons whose pursuits or studies, or experience have given them a familiarity with the matter in hand. But where the question can be decided by such experience and knowledge as are ordinarily found in the common business of life, the jury are competent to draw the inferences from the facts without having the opinions of witnesses."

In *Ferguson* v. *Hubbell*, 97 N. Y. 507, JUDGE EARL has stated the rule with a clearness and precision which will justify reference to that case, He said, "It is not sufficient that the witness may know more of, or better comprehend the subject, than the jury, but it must relate to some *trade, profession, science, or art*, in which persons instructed by study or experience, may be supposed to have more skill and knowlege than jurors of average intelligence."

In *Stumore* v. *Shaw*, 68 Md. 19, this Court said, "If the

relation of facts and their probable results can be determined without special skill or study, the facts themselves must be given in evidence, and the conclusions or inferences must be drawn by the jury." Here, it is manifest that the probable results of the absence of guards or barriers, at this draw, could as well be determined by the jury as by this witness, who was not shown to possess any special skill or knowledge, derived from, or relating to, any trade, profession, or technical pursuit, which would qualify him to instruct the jury, and it was therefore error to admit his opinion.

The only other exception is to the ruling on the prayers. The plaintiff offered three, all of which were granted, and the defendants offered seven, of which the first, second and third were refused, and all the others were granted. The plaintiffs' third prayer on the measure of damages requires no notice, but we shall request the reporter to set out all the others in full, for the better understanding of the effect upon them of the view we shall express. We have already sufficiently stated the means adopted by the defendants to warn travellers by night, of the existence of this draw, and of its condition as it is approached, and have detailed some of the testimony showing how the accident occurred. In addition to this, the plaintiffs' witness, Weedon, who was at the time about 150 yards further from the draw than the deceased was, testified that he knew by the lights that the draw was open, and the evidence is uncontradicted that the deceased was familiar with the use of the bridge and draw and with the purpose and plan of the lights on the bridge and on the draw. In addition to the warning given by these lights, Capt. Frank testified that as he approached the draw in his bugeye he blew his whistle to notify the bridge keeper who opened the draw in response, and that his boat had a loud exhaust which could be heard for half a mile; also that it made more noise when passing through a draw, than in ordinary navigation of the river, and that he was not more than seventy feet from the draw after passing through it when he heard a splash on the other span of the draw, and the keeper called to him to come back.

Mr. Chinn, an engineer and surveyor, who was familiar with the bridge, testified that the lights could be seen even on a foggy night at least for a distance of 500 feet.

Elzey Perry, on the night in question at 7.30 o'clock, was passing through the draw in a small launch, through the span on the Annapolis side, into which the plaintiff fell; that he saw the draw opening and all the lights on the bridge and draw, and that he heard and saw the team coming, and heard Capt. Frank's whistle, and the exhaust of his boat; that the team came up in a trot and stopped; that he saw the man in the buggy, and saw the horse stop; that he heard something like a whip cutting and "the horse jumped right in;" that he was standing up in his boat; that "the team came right up to the edge; and the horse stopped with his forefeet near the edge; that he himself was about 20 feet from the team, and "looked at the team to see whether it would get into the boat." He said he did not see any whip and could not say whether there was one or not in the carriage, but there was evidence tending to show that the plaintiff did not have a whip at that time. Mr. Tydings testified that he knew the horse the plaintiff was driving, that he was a good road horse, and did not need the whip; that he had often seen him on the road, and that "whenever the reins were drawn on him he would shoot ahead." It is thus not material whether there was a whip or not, or whether the sound heard by Perry was from a whip, or from the drawing of the reins since either cause would account for the forward movement of the horse.

There is no contradiction of any of the material facts stated in the foregoing summary of the evidence in the case, and we think it clearly appears therefrom that the plaintiff was grossly negligent and that his death was directly due to his own negligence. He was not a stranger to the premises; he was familiar with the bridge and with the working of the draw, by his use of the bridge in driving across it by night and by day. He was also an oysterman, and as such familiar with the use of the river at that point where oysters are constantly taken. He was therefore necessarily acquainted with significance of

the lights used, both for the purposes of travel across the
bridge, and for the passage of boats through it. ˙ If he had
looked when he drove on the bridge, or at any point after he
passed Weedon, he must have seen that the position of the
red lights indicated that the draw was open.   If he had lis-
tened, he must have heard the whistle of Capt. Frank's boat
signaling for an open draw, and the noise of the exhaust grow-
ing constantly louder as the boat approached.   There is no evi-
dence that he was deficient either in the sense of sight or hear-
ing, yet with the fullest opportunity both to see and hear the
signals of his peril, he plunged recklessly into the open draw.
The duty of a traveller about to cross a railroad, to stop, look,
and listen, both upon principle and authority, is equally imper-
ative when approaching a draw bridge.   There is no case in
our own Court of Appeals where this rule has been actually
applied to a draw bridge, but there is a near approach in prin-
ciple in *County Commissioners* v. *Burgess*, 61 Md. 32, where
the Court in considering upon whom lies the burden of show-
ing contributory negligence on the part of a plaintiff, and in
holding it to be upon the defendant, said, "This rule has been
laid down in suits against rail roads for injuries caused by
them, and we see no reason for establishing a different rule
as applied to accidents occasioned by defective roads or
bridges.   The presumption that a man will act prudently
and with care for his own safety, and will not recklessly rush
into destruction, must exist in the one case as in the other."
In *Stephanis' case*, 101 Wis. 59, the rule was directly declared
to be applicable, the Court saying: "It is admitted that the
intestate had crossed the bridge both in the evening and in
the daytime; that she must have known it was a swing bridge
that it was frequently opened, and that there were no guards,
and that the person who walked off from the bridge would go
into the river.   *   *   *   *   Could she say to herself that
bridge ought to be closed, or if open, I can assume there is
a guard which will prevent my falling into the chasm?   Or
must she say to herself I must use my eyes and ears to the
best advantage to guard against the possibility of walking into

the open draw?    Reason and common sense indicate but one answer to these questions, and that is that she must adopt the second course if she would exercise ordinary care.  * * *

"The approach to a swing bridge is an advertisement of danger to one who knows the character of the bridge which speaks as loudly and as logically calls for as great an exercise of care, as the track of a railway.   The possible yawning chasm is as great and real a danger as the possible rushing locomotive, and the warning that it may exist is just as emphatic.   The requirement of ordinary care in approaching a bridge would not be satisfied by looking down in front, but would require looking ahead and if, as appears beyond dispute in this case, there was a light immediately ahead which, when looked at, would show that the bridge was open, then the failure to look and observe would be a failure to exercise ordinary care uuder the circumstances."   The language of this well considered case might well have been written upon the facts of the present case, and upon those facts the only rational conclusion is that Stansbury went to his death while negligently sleeping, or while oblivious to the plain peril, or from some other equally negligent act or conduct. It follows from what we have said that the defendants' second prayer withdrawing the case from the jury because of the contributory negligence of the plaintiff, was erroneously refused. and as in this view of the case there can be no recovery, the judgment must be reversed without awarding a new trial.

We shall not enter into any discussion of the other prayers, but if the plaintiffs first prayer was designed to assert the proposition that the failure to provide barriers at the draw, instead of, or in addition to, the system of lights used to warn travellers at night, constitutes negligence in law on the part of the defendants, we are not to be understood as committed to that proposition, nor as determining whether there is, or is not, any legally sufficient evidence of any negligence on the part of the defendants.

*Judgment reversed, without awarding*
*a new trial, costs above and below*
*to be paid by the appellees.*