# MRS. ABEL A. ROSENBURG

*vs.*

## STATE, Use of Ethel A. Ambrose.

*Experts: hypothetical questions; misconception of—; effect of answer. Evidence: improperly admitted; instructing jury to disregard—. Prayers: terms somewhat unusual; "predisposing cause." Negligence: plaintiff's; burden of proof; need not negative all other possibilities.*

When the answer of an expert to a hypothetical question is manifestly mistaken as to the facts, and it is clear that his answer, as made, was because of that mistake, and because he relied on what he assumed to be facts which were not in the question, his answer should be stricken out and excluded from the consideration of the jury.                          p. 424

When evidence which has been improperly admitted is afterwards stricken out by the court, in order to correct the error, the jury should be clearly informed that such evidence has been stricken out and they should be specially instructed not to consider such testimony.                          p. 425

The granting of instructions in which there are somewhat unfamiliar terms ("predisposing cause") does not constitute reversible error when, apparently, the attorneys understood the expressions when given by a witness and did not ask them to explain them to the jury.                          p. 428

In an action for damages for injuries or death resulting from the negligence of the defendant, the law does not cast upon the plaintiff the burden of excluding by affirmative evidence every other possible way by which the injury could have been sustained.                          p. 430

*Decided December 13th, 1916.*

Appeal from the Superior Court of Baltimore City. (GOR-TER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.

*Walter L. Clark* (with whom were *George W. Dexter, Clapham Murray, Jr., Austin J. Lilly* and *Charles T. Reifsnider* on the brief), for the appellant.

*Edgar Allan Poe* (with a brief by *Bartlett, Poe* and *Claggett*), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered against the appellant in favor of the appellee for injuries sustained by J. Herbert Ambrose, the husband of the equitable plaintiff, which resulted in his death, and which it is alleged were caused by the negligence and want of care on the part of the defendant (appellant) in operating an automobile. Mr. Ambrose was riding on the back seat of a motorcycle, owned and operated by Clarence Frey, which it is alleged in the *narr,* collided with and was struck by an automobile being driven by the defendant. The accident occurred on the 22nd day of August, 1914, and Mr. Ambrose died on May 22nd, 1915.

At the beginning of the trial below it was "stipulated and agreed that the death of J. Herbert Ambrose resulted from sarcoma, leaving the cause of the sarcoma open for determination under the evidence in this case." The appellee claims that it was the result of the injury, while the appellant contends: First, that there was no legally sufficient evidence of any negligent act or omission by her causing the accident; and second, that there was not sufficient legal evi-

dence from which a jury could have properly, found that the injury caused sarcoma.

There are seven bills of exception relating to the admissibility of evidence, and an eighth which presents the rulings on the prayers. The plaintiff offered two prayers, which were granted, and the defendant offered twenty; the ninth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth and eighteenth of which were granted, and the others rejected. The defendant also filed special exceptions to the granting of the plaintiff's first prayer, which were overruled. The first exception was to allowing a hypothetical question to be asked and answered by Dr. John S. Manger, and the second was to overruling a motion to strike out his answer to that question. The question was as follows: "Now, then, it has been testified that J. Herbert Ambrose, prior to August 22, 1914, was a young man of apparently good health and physical condition and apparently had no trouble with his left leg; that in a collision that occurred on that day between an automobile and a motorcycle, upon which he was riding, he was hurled with great force either against the automobile or upon the ground, and badly jarred and shaken up and bruised upon the left knee; that he was confined to his house for several days, and then resumed work; that shortly thereafter he began to experience trouble with his left leg which caused him to limp; that the condition of his leg gradually grew worse and the leg began to swell between the knee and the thigh; in the latter part of November, 1914, the leg was opened and it was discovered that he was suffering from osteoid sarcoma. Assuming all these facts to be correct, will you state what, in your opinion, was the cause of the osteoid sarcoma?"

The answer was: "It was due to traumatism." Without deeming it necessary to discuss separately the ruling in the first exception, we are forced to the conclusion that there was error in not striking out the answer to the hypothetical question. Dr. Manger had testified in chief that sometime prior to Christmas of 1914, J. Herbert Ambrose called at his office

and asked him to examine his leg—stating that he had been injured. Two or three weeks after he first examined him he had him taken to the hospital, where an exploratory incision was made and his leg opened up for examination. He was present when the leg was opened and he described the conditions that were found, and said that "there was a culture made of it and the growth was found to be malignant." He further testified that: "The diagnosis, when I first seen it, was a probably simple periostitis. We mean by that an inflammation of the tissues surrounding the bone, the periosteum, the covering, and we sometimes have that with an ordinary injury, a blow or anything of that kind. After the leg was opened up, and the culture made, it was determined to be a form of sarcoma. There is a difference in sarcomas; some of them we do not know where they come from. They are malignant growths that appear at certain ages and places. Susceptibility probably has something to do with it, and there is another kind called osteoid cancer, which is a cancer produced by a blow or an injury more frequently than any other way. There are a few cases where they can come without an injury, but these are the ones that develop the most rapidly. In this case I diagnosed it as osteoid cancer. * * * Osteoid sarcoma is a malignant growth which develops very rapidly—one of the most rapid developments we have where there is an injury received."

He also said: "Traumatism is an injury—the coming together of the limb or bone with anything, any hard substance—rock, iron, stone or anything. It was due to the injury. Sarcoma is more progressive when produced by an injury. It is very much more rapid." Then on cross-examination he said: "Sarcoma is perfectly painless at times. There is no way to determine its presence until the swelling begins. It varies in rapidity of growth with the conditions and the persons, developing slowly sometimes and rapidly sometimes. In the same person it may start slowly and then develop rapidly. We cannot tell by examination when

the sarcoma really began." In his cross-examination the following also appears: "Q. Now, the ordinary history of sarcoma of the great—the vast majority of the cases of sarcoma, has no reference to any traumatism at all, has it? A. No. * * * Sarcoma is occasionally associated with an accident, in my mind. The cause of sarcoma is not definitely known. It is caused by an injury at times. We know that, but other conditions we do not know. Accident does not always cause sarcoma. Q. The form of sarcoma that Mr. Ambrose died from could have developed in a purely natural manner—that is, without the connection of any traumatism or injury, could it not? I do not mean in this case, but just taking another case, that type of sarcoma could have developed without any accident at all? A. Oh, yes, yes. It would not have had as rapid a termination, of course. When you asked me the question, I was bound to say they are not all due to traumatism, not all caused by injury; but as I say, they can come without any injury at all to any parts of the body, the legs, arms, mouth, anywhere. Q. (Mr. Poe): But you say they would not have had such a rapid termination as in this case? A. No, not usually. The rapidity of the growth of sarcoma, even where it comes without traumatism varies, and varies in the same patient sometimes. As with every disease, it may start slowly, and later become rapid. Time does not play an important part, except where there is an injury, and then the time is very much less. Q. Doctor, in order to assume that a previous traumatism has any bearing on the development of a sarcoma, I would have to state to you the time when the traumatism occurred, or the accident occurred, the place where the accident occurred, and the extent of the injury, would I not? A. Yes. Q. So in order for you to, especially in this class of sarcoma of the periosteum, say, you would have to know the injury to the periosteum in order to decide whether that sarcoma had anything to do with the accident, would you not? A. Yes. Age is a great factor there. * * * There must be an

injury to the particular tissue in which the sarcoma develops. Q. That is, in order for the sarcoma to develop in the periosteum, the covering surrounding the bone, there must be an injury to that periosteum, or an injury to the bone? A. Yes, sir. Q. The injury must not only be to the covering surrounding the bone, but it must be right at the place where the sarcoma develops? A. Yes, sir. The sarcoma developed in probably the middle third of the thigh, right along the outside. I would not attempt to connect up an injury to the knee with a sarcoma in the middle third of the thigh. Of course, there are ligaments attached to the knee joint, with the possibility of the injury extending up here (indicating the thigh), but in this particular case I know the sarcoma developed right at that particular place."

Then after repeating the hypothetical question, and his answer, counsel for the defendant inquired of the doctor as follows: "Now, what particular fact in that question serves as the basis for your opinion of traumatism? A. The most particular fact which stands out there is the short duration by which it caused his death. Q. You had never treated this young man before he came to you at this time? A. No, sir. Q. To determine the duration, you, of course, took his statement as to the period of time? A. Yes, I do not know whether he said a week or two prior to that; I do not know now what time he left from the time he was injured until he consulted me in regard to his injury. Q. That is the salient fact in that question, then, which enables you to say the sarcoma was due to traumatism? A. Yes, sir; he said the injury was right there (indicating the thigh)."

The further testimony of the doctor shows clearly that he understood the accident had occurred a week or two before Ambrose called on him, and he was asked the question: "Now, if time was essential in making and drawing the conclusion that the sarcoma resulted from an accident, any mistake as to the length of that time would, of course, affect your conclusions, would it not? A. Yes, sir. Q. In other

words, if the young man, instead of coming to you a week after the accident, came three or four months after the accident, it would make a big difference in your opinion, would it not? A. Undoubtedly, yes; it depends upon the severity of the injury. Q. So the answer you gave to Mr. Poe's hypothetical question was also based upon your assumption that at the time you saw him he had been injured about a week before? A. About a week or ten days; yes, sir. I had no history of any previous injury. He did not give me that. People are confined to bed many times for three or four days without having sarcoma. Q. Would it be possible for you to examine a man suffering from sarcoma, without any history of the case, and to determine from the condition of his bone and the cells what caused that sarcoma? A. No, sir . Q. It would not? A. No, sir. Q. So without a history you could not say whether traumatism had anything to do with it? A. We customarily ask them, Have you been injured? Q. That is necessary in order to determine whether traumatism has anything to do with it? A. Yes, it helps us in our diagnosis, and it has a bearing on the case."

It is manifest then that Dr. Manger was mistaken as to the facts and answered as he did because of that mistake. and he relied on what he assumed to be facts, which were not in the question. Although the hypothetical question assumed that the accident occurred on August 22nd, 1914, the doctor for some reason misunderstood or overlooked that, and said it would make a "big difference" in his opinion if Ambrose went to him three or four months, instead of a week, after the accident. The accident was in point of fact on the 22nd of August, instead of in November. Moreover, his cross-examination shows that he based his opinion on what he said Ambrose told him as to when and where the injury was, instead of upon what was in the question.

There is apparently some confusion in the Record, as according to it, after the Court had overruled the motion to strike out the testimony of Dr. Manger, given in answer to

the hypothetical question, other testimony was given by him and then the Court asked if counsel desired to argue the motion. The attorney for the defendant replied that he did. The jury then retired and there was an argument on the motion. What happened is thus shown by a certificate of the judge: "It is stipulated by counsel, and here certified to by the Court, that after motion was duly made to strike out the testimony of Dr. Manger in answer to the hypothetical question propounded by the plaintiff's counsel, the Court reiterated its refusal to strike out its said answer, but, during the absence of the jury counsel for plaintiff agreed that the aforesaid answer of Dr. Manger should be stricken out, whereupon the Court said: 'Then I will strike out the answer of Dr. Manger to the hypothetical question.' That the aforesaid statement of the Court was made in the absence of the jury, and through inadvertence, was not communicated to the jury upon their return to the Court room, nor at any other time. It is further certified that counsel for neither plaintiff nor defendant mentioned in the argument the aforesaid answer of Dr. Manger, and that each treated the answer as having been eliminated, and the fact that its elimination had not been communicated to the jury by the Court did not occur to either counsel until the jury had rendered its verdict."

It is contended on the part of the appellee that under the circumstances the first and second bills of exception are not properly before the Court for determination, as the appellant is estopped from raising any question about the hypothetical question. When evidence which has been improperly admitted is afterwards stricken out by the Court, the well established rule is that in order to correct the error the jury should be clearly informed that it has been stricken out, and many of the authorities hold that the jury must be specially instructed not to consider the testimony so stricken out. See *Washington Gas Light Co. v. Lansden,* 172 U. S. 534; *Raisler v. Benjamin,* 118 N. Y. Supp. 223; *Groh's Sons v. Groh,*

177 N. Y. 8, S. C. 68 N. E. 992; *Allen v. Boston El. Ry. Co.,* 212 Mass. 191, S. C. 98 N. E. 618; *Southern Ry. v. Simmons,* 105 Va. 651, S. C. 55 S. E. 459. Numerous other cases could be cited, but the subject is fully discussed and many authorities cited in 38 *Cyc.* 1440, etc. It is there said: "The general rule is that, if evidence erroneously admitted during the progress of a trial be distinctly withdrawn by the Court, the error is cured, except in extreme instances where it is manifest that the prejudicial effect of the evidence on the jury remained despite its exclusion and influenced their verdict. On the other hand, it is held in some cases that error in admitting improper evidence is not cured by striking out, unless it appears that such evidence did not affect the verdict. In order to effect a cure the withdrawal must be as broad as the admission, and the charge must be sufficiently definite to clearly identify the portion to be withdrawn, and so explicit and unequivocal as to preclude the inference that the jury may have been influenced thereby. Moreover, the withdrawal must be by act of Court and not of counsel; it may be made of the Court's own motion, or at the request of a party." Again on page 1441 it is said: "The general rule is that, if inadmissible evidence has been received during a trial, the error of its admission is cured by its subsequent withdrawal before the trial closes, and by an instruction to the jury to disregard it, or even by an instruction to disregard without more, the view being taken that such an instruction is equivalent to striking the improper evidence out of the case." See also 2 *Ency. of Pl. and Pr.* 560, to the same effect.

In *Boone v. Purnell,* 28 Md. 607, evidence objected to was ruled admissible by the Court, and afterwards withdrawn with the consent of the Court by the party offering it. It was held that "it being withdrawn *and the jury directed not to consider it in making up their verdict* (italics ours), we can not see that any harm resulted to the appellants, or any error was committed requiring the intervention of this Court in

their behalf." See also *Prov. Life Ins. Co.* v. *Martin,* 32 Md. 310, which approved *Boone* v. *Purnell.* After a most diligent search we have been unable to find any case which held that the error was cured under such circumstances as we have before us. The evidence was very important, as the other two physicians who testified differed in their views of sarcoma, and inasmuch as Dr. Manger testified that the sarcoma was due to traumatism it may have had great effect on the jury—especially as he had attended Ambrose. While the certificate of the Judge shows that neither attorney mentioned it in the argument, the fact that the answer had been stricken out was not communicated to the jury. As the Court had admitted the evidence over the objection of the defendant and it was still before the jury, without any knowledge on their part that there was any question about its competency, it was not only the right but the duty of the jury to consider it. While the certificate of the Judge does not refer to the other testimony of Dr. Manger, or show how much it was relied on in argument, a considerable part of it was material, relevant, and unobjectionable, and presumably some of it was referred to in the course of the argument. That would naturally suggest this most important item of evidence, even if not referred to. We are, then, of the opinion that the error in refusing to strike out the answer to the hypothetical question asked Dr. Manger was not cured by what was done out of the presence of the jury, and we can not say it was harmless. We have not thought it necessary to further discuss the form of the question—as to whether it trespassed upon the province of the jury, etc.,—as what was brought out on cross-examination showed clearly that it should have been stricken out.

The third exception is not pressed, as we understand, and we see no objection to the question and answer contained in it. The fourth, fifth, sixth and seventh relate to a hypothetical question asked Dr. Fisher. The facts stated in it were for the most part similar to those in the one asked Dr. Manger

with some additional ones. It stated that Ambrose "received numerous bruises on his body, and that two small bruises appeared four or five inches above the left knee"; that "the leg was opened up about midway between the knee and the hip and it was discovered that he was suffering at that locality from osteoid sarcoma of a malignant type. He died May 22, 1915, after an amputation of the leg at the thigh in the latter part of November, 1914, or the early part of December." The question was: "Assuming all these facts to be correct, state whether or not in your opinion, the injury from the collision was the predisposing cause for the development of the sarcoma." The question was objected to and the objection overruled as shown by the fourth bill of exceptions. Counsel for the defendant said: "I would like Mr. Poe to ask the doctor whether he had given him sufficient facts in that question from which he can answer it with a reasonable degree of certainty." The witness answered: "Yes, I think that is enough information. I should say that if the growth developed in the region in which the injury had occurred, that the injury would have to be considered as the predisposing cause." A motion was made to strike out that answer which was overruled, and that constitutes the fifth exception. That motion was renewed later on and again at the conclusion of all the testimony. Those motions were overruled and the rulings are presented by the sixth and seventh exceptions.

The term used in the question is unusual—when it speaks of the injury from the collision as "the predisposing cause," etc. It may have some special meaning to the medical profession, but, if it has, it is not explained in the record. The attorney for the appellant criticised it but did not, so far as the record discloses, find it necessary to inquire of the doctor what it meant. The word "dispose" is defined in the *New International Dictionary,* amongst other definitions, "to give a tendency to; to make liable; as to predispose the mind to friendship; debility predisposes the body to disease." In the *Standard Dictionary* under the second head, it is defined,

"To make liable or susceptible." It might thus be said to mean, in the connection it was used in this question, whether the injury caused Ambrose's leg to have a tendency to or to be liable to the development of the sarcoma, or, adopting the definition in the *Standard,* it would apparently mean, whether the injury caused the leg to be liable or susceptible to the development of the sarcoma. While it would have been better to have used a more familiar term, which could be more readily understood by the jurors, the attorneys apparently understood it, as they did not ask the doctor to explain what he meant, and presumably explained it to the jury. Without prolonging the discussion of Doctor Fisher's testimony, we find no reversible error in any of the exceptions in reference to it.

There was no error in granting the plaintiff's prayers, or either of them. The defendant's first, second and third were properly rejected. There was evidence tending to show that the appellant was at the time running the automobile, and that there was negligence on her part. The witness Chaney, who was driving another automobile and saw the accident, testified that he distinctly heard the driver of the motorcycle blow the exhaust whistle, which was very loud and shrill, when the motorcycle was between a hundred and a hundred and fifty feet from the intersection of Park Heights Avenue and the Valley Road, where the accident occurred. He said: "There was a machine coming towards me, over a small grade, about three hundred feet away from the intersection. A young lady was driving it, with a chauffeur sitting beside her. I heard no signal from the automobile. It was going about as fast as the motorcycle, between fifteen and eighteen miles per hour." Again he said: "She had slowed down some, but I imagine she was going between ten and twelve miles per hour when she attempted to make the turn. It is very sharp, a right-angle turn. You have to slow down anyway, because the roads are narrow—eighteen feet, I think—and if you don't slow down considerably you have to cut the

corner very much to get in. Any one coming over fifteen miles per hour could not make it at all." On cross-examination he said: "If Mrs. Rosenburg had blown her horn I would most likely have heard it, as I could have heard any horn sounded at that distance and I did not. I watched the motorcycle all the way up. I saw Mrs. Rosenburg in the driver's seat at the time of the accident. I was fifteen or twenty feet from her. Her chauffeur was not driving the machine; she was driving it herself. He could not drive it if she was in the driver's seat. I saw her have hold of the wheel just as she made the turn. The chauffeur did not have hold of the wheel. * * * The automobile came from the centre of the road and cut directly in as she attempted to turn into Park Heights Avenue. The accident occurred nearly in the centre of the road." Clarence H. Frey, who was driving the motorcycle, testified that he was sitting on the front seat and Ambrose on the rear seat—that Ambrose was not directing or controlling it in any way; that he blew the exhaust horn three times and got no response, and as he got no response he thought the road was clear and just as he got to the intersection an automobile "jumped out". He said: "When I told her it was her fault she said she carried no bulb horn and that her electric horn was broken. According to her statement, she had no means of notifying us, by sounding her horn, at all. She said something about being a beginner; that she had not run it long; but was just a learner at it." The fourth prayer was likewise properly rejected. There is evidence tending to show that the death of Ambrose "was proximately caused by the accident as alleged in the declaration." If the appellant's theory must prevail, it will be impossible to establish liability on the part of a negligent defendant, unless the plaintiff affirmatively excludes every possibly way by which death may have resulted, or an injury could have been sustained. Such is not the law. It would be very difficult to persuade any twelve men that the injury in this case was not the cause of the sarcoma, which it is ad-

mitted produced the death. There is ample evidence to sustain such a verdict. The fifth prayer is manifestly defective because it ignores the evidence offered by the plaintiff, that the appellant was running the car. The sixth ignores the evidence of the appellant herself that she was in the driver's seat in control of the horn, which the evidence of the plaintiff tends to show was not blown, if she had one, that she had one or both hands on the wheel, that the chauffeur could not reach the hand brake, and could only reach the foot brake "by reaching across her in a very awkward position," to use her language—in short, she was at least assisting in running the car at the time of the accident, according to her own admissions. The seventh is faulty because it ignores the facts just spoken of, that she had charge of the horn, and did not use it, according to the plaintiff's evidence, and she had control of the brakes. When it required the jury to find that the defendant "interfered" with the operation of the automobile that was liable to mislead them under the circumstances. What we have already said is sufficient to show that in our judgment the eighth was properly rejected. The tenth was also, as there was some such evidence. The nineteenth and twentieth were clearly properly rejected, and the special exceptions to the plaintiff's first prayer were properly overruled. The defendant's prayers which were granted were as favorable to her as she could ask under the evidence, and the law applicable to the case.

It follows that the judgment must be reversed, for the error pointed out in reference to the testimony of Dr. Manger, although we find no other reversible errors.

*Judgment reversed and new trial awarded, the equitable appellee to pay the costs in this Court, the costs below to abide the final result.*