INDUSTRIAL SERVICE COMPANY *v.* STATE, USE OF FREDERICK E. BRYANT ET AL.

[No. 47, April Term, 1939.]

626

*Decided May 17th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*William L. Marbury, Jr.,* and *Jesse Slingluff, Jr.,* with whom were *L. Wethered Barroll* and *Marbury, Gosnell & Williams* on the brief, for the appellant.

*Z. Townsend Parks, Jr.,* and *George B. Woelfel,* for the appellees.

JOHNSON, J., delivered the opinion of the Court.

Hilda Bryant, aged forty-one, departed this life on August, 19th 1937, leaving surviving her a husband Frederick E. Bryant, and six children, the following of whom are infants: Ethel Mattie Bryant, Wylie Lee Bryant, Dorothy Una Bryant, and Jane Hilda Bryant. The husband and children contended that Mrs. Bryant's death was caused by the negligence and wrongful act of the servant and agent of the Industrial Service Company, a body corporate, acting within the scope of his employment. Accordingly, under the provisions of Code Article 67, suit was instituted in the name of the State,

for the use of the surviving husband and infants, against the corporation, in the Superior Court of Baltimore City, pleas were filed to the declaration, and at the first trial a verdict was rendered for the defendant under the instructions of the court. Two days later plaintiffs moved for a new trial, and that motion was granted, and subsequently, upon a suggestion of removal, the case was sent to the Baltimore City Court for trial, which was held January 23rd, 1939, and resulted in a verdict in favor of the equitable plaintiffs for $9720, which was duly apportioned between them. Before that judgment became absolute, the defendant filed a motion for a new trial, and after a hearing thereon that motion was granted, unless the plaintiffs filed a remittitur of $3720 of the original verdict, deducted proportionately from the amounts allowed the various equitable plaintiffs by the verdict. That remittitur was filed, whereupon judgment on the verdict absolute in their favor of $6000 was entered as apportioned, and from that judgment, the present appeal is taken.

Three exceptions, reserved by appellant during the course of the trial to the rulings of the trial court, are relied upon to support a reversal of the jugdment. Two of these relate to rulings on evidence, while the third pertains to rulings upon the prayers. During our consideration of the evidence, reference to those exceptions will be made in the order in which, during the course of the trial, they were reserved.

Specifically, with reference to the third exception, the contention is advanced by appellant that the trial court committed error (1) in refusing to grant its A prayer instructing the jury that although they found a verdict for the equitable plaintiffs, they could not assess any sum whatsoever as damages, because no evidence had been adduced from which it could be found that they had suffered any pecuniary loss as a result of Hilda Bryant's death, and (2) in refusing its B prayer directing the jury to find a verdict for the defendant, because of an alleged legal insufficiency of evidence to entitle the equitable plain-

tiffs to recover. Since those instructions were offered at the conclusion of the entire case, and after evidence had been submitted by both of the parties, it becomes necessary to review and analyze that evidence for the purpose of ascertaining the correctness of those rulings.

Counsel for appellees, both in their brief and oral argument before this court, devoted much effort in discussing matters pertaining to the present and past financial situation of Frederick E. Bryant, which were entirely unjustified, inasmuch as no proof touching those matters is contained in the record. However, on the whole record, a legitimate inference does arise that Bryant was rather impecunious, for at various times he had secured loans from appellant, and on August 5th, payments upon one of those were in arrears.

A careful consideration of the record discloses that from the testimony given by lay witnesses, the jurors could have found that John B. Cain, Jr., was appellant's agent, but his duties did not require him to collect money from defaulting borrowers, for as stated by him, "My job was to jack them up, make them come to Baltimore and make their payments and to find out why they were in arrears"; that on August 12th, 1937, he appeared at the Bryant home and greatly disturbed Bryant's wife, because she had not paid his employer; that, over her protest, he sat on the floor of the home until he had exacted a promise from Mrs. Bryant to come to Baltimore and make payments early in the following week. This she failed to do, because she was without funds, and seven days later, while the mother and children were having lunch, he reappeared, and when Mrs. Bryant, who had partially opened the door, noticed who he was, she attempted to close it, but he stuck his foot in the open space, endeavoring to discuss the loan with her. She told him she had not been in, because she did not have any money, and requested him to leave, and attempted to push him out of the door, whereupon he slapped her in the face, and told her that she did have the money, because her husband and her son were working. The en-

counter between her and Cain continued, and finally he withdrew to the grape arbor in the rear of the house and was pursued by her; he not only inflicted wounds upon her shoulders, arms and wrists but twisted her wrists so hard that he forced her to her knees, which resulted in tearing the skin therefrom. Eventually he got into his automobile and drove away, after first laughing at and insulting her daughter who remonstrated with him. From that time on Mrs. Bryant was greatly agitated, nervous, upset, and suffered intense pain. Her body shook violently, she cried much of the time and continued to chew her finger nails. On the evening of that day, accompanied by her husband, she went before a justice of the peace and swore out a warrant for Cain, charging him with having assaulted and beaten her. With her husband, she returned to the office of the magistrate five days later, at which time Cain was convicted, but at the trial she experienced great difficulty in testifying, for when she recalled the events of the twelfth, she would choke up, and while her statements were not contradictory, she simply could not detail the events in a coherent manner. Upon their return to the Bryant home, after the trial, they were compelled to stop on the way because of a flat tire, and she insisted that they turn back, fearing Cain would come out of the woodland and attack her. Although at times she seemed somewhat quiet, when Cain's name was mentioned she was as agitated as ever and continued to cry, shake her body, and bite her nails. On the evening of August 12th, she was so uncomfortable that neither she nor her husband got any sleep whatever, and the following morning Dr. Lipsky was called in.

On the evening of August 19th, she seemed quiescent, and she and her husband were sitting upon the porch listening to the radio, when an automobile was driven to the house by a Mr. Sutton, appellant's manager, who got out, went upon the porch and spoke to them, saying he regretted very much that Cain's conduct had caused him to be arrested and he wished to ascertain the details. Bryant started to give his version of what occurred, and

Sutton insisted that his wife do the talking. Bryant told him that, whenever she attempted to discuss it, she became greatly agitated and he preferred for her not to discuss the matter. He (Bryant) thereupon proceeded to describe Cain's conduct, especially on August 12th. During this time Mrs. Bryant continued to sit in her chair and finally, after speaking a few words, began clearing her throat. Bryant and Sutton stopped talking, she again cleared her throat, and went into the house, they thought to get a drink of water. Very shortly thereafter, two of Bryant's little children ran out on the porch and informed him that their mother was dying, that she said she was dying, whereupon he and Sutton went through the house and found Mrs. Bryant in the back yard leaning upon an old ice box. She recognized her husband and said, "Honey, I am going to die, take care of the children." They carried her into the house, placed her in a reclining position and immediately called Dr. Lipsky. Although he arrived promptly and injected strychnine into her heart muscle, she died twenty minutes later.

While an entire week had elapsed since she was attacked by Cain, after her death bruises from that encounter were observed upon her body by the undertaker.

Prior to August 12th, Mrs. Bryant had never required the attention of a physician, excepting during childbirth, and was always able to perform her household duties, assist her children with their lessons and send them to school, yet from that date until her death she was never herself, nor was she able to perform any of her customary duties in the household.

Plaintiffs also produced as a witness Morton Kramer, whom they qualified as an expert on mortality tables. He testified that the life expectancy of a wife 41 years of age was 29.9 years, while that of a husband at 53 years of age was 19.8 years, and added that the joint expectancy of a married couple of those ages was 17.4 years.

Two medical men testified for the plaintiffs, and one of them was concededly an expert upon diseases of the heart, but, never having seen Mrs. Bryant, he was compelled to base his findings upon the testimony of Dr. Lipsky. The latter, who first saw Mrs. Bryant on the morning of August 13th, found her very nervous, shocked, and extremely garrulous, observed abrasions on the left side of her face, upon her forearms, and contusions on both wrists. At that time her blood pressure was abnormally high and she complained of discomfort in her heart region. His examination further disclosed that her pulse rate was 118, and the heart registered booming sounds over its apex. In addition to dressing her wounds and prescribing for her, he advised rest, and did not see her again until August 19th, after she had collapsed. The doctor concluded that the immediate cause of death was acute coronary thrombosis, probably on a hypertensive basis, and identified a certified copy of the death certificiate previously given by him to the same effect.

Dr. Eastland, the heart specialist, had been in court throughout the trial and heard all testimony in the case introduced on behalf of the equitable plaintiffs, and stated that upon the assumption of its truth, and excluding opinions, he had an opinion as to the cause of death which because of its rapid onset and Dr. Lipsky's findings he attributed to coronary thrombosis. He further stated that shock and fright would affect a good heart by increasing pulse rate and some elevation of blood pressure, but that shock and fright upon a person suffering from a disease of the coronary artery would cause a spasm of that vessel, which upon occlusion prevented the blood from entering, and clotting ensued within the vessel and added "that is the chief effect of emotional factors on a coronary vessel." Subsequently, over defendant's objection, he testified that the coronary thrombosis in the case of Mrs. Bryant was precipitated by the emotional disturbances occurring at her home at the time of and preceding her death. That ruling occasioned the first exception.

The witness was unable to say what time was required for a heart to develop a diseased condition or impairment of the coronary artery, and stated that no one could answer that exactly, but the disease of the coronary vessel may have taken place in a period of weeks, months or years; that in his opinion Mrs. Bryant suffered from a coronary ailment prior to her encounter with Cain, but he considered that her experience at the trial before the magistrate was not a contributing factor in causing the thrombosis. He concluded as follows: "An emotional factor may not cause death, but the same factor can ultimately produce death or equal weight, and that is sustained, if you will just glance through your text books over there."

Hazel Shank, who is connected with the State Employment Service, testified of placements of housekeepers made in Anne Arundel County. The trial court refused to permit her to state the average wage at which domestic help in Anne Arundel County had been placed, but added: "If you want to ask her what is the usual and customary charge, if she can tell of a woman that performs the service of a housekeeper per month, I will admit that, if she will give you the minimum and maximum amounts." Over objection, she was permitted to state that it ran all the way from maintenance up to $18 and $20 per week, and that maintenance was food and clothing. To that ruling, the second exception was reserved.

The defendant called three witnesses, one of whom was its manager, Sutton, whose testimony related to his visit to the Bryant home, and is not in conflict with Bryant's version as to what took place, except he stated that upon Dr. Lipskys' arrival at that home, upon examination of Mrs. Bryant, he had remarked, "It's a stroke all right." This, however, in effect was denied by the doctor.

A second witness was Cain, who testified to the effect that he had not in any manner assaulted Mrs. Bryant, and his conduct on August 12th was limited strictly to

a defense of his person, while J. Albert Nahm, a third witness, who, on the occasion of Sutton's visit to the Bryant home, sat in the automobile most of the time, testified that he had an opportunity to observe Mrs. Bryant's wrists and they appeared normal to him, and he saw no marks or bruises upon them.

Obviously, although the matters to which appellant's witness testified were relevant, since the jurors were judges of the facts, it is not our function to decide as to which group of witnesses testified truthfully. For this reason, in dealing with the rulings of the trial court, no further consideration need by us be given to the testimony of those witnesses.

Returning to the first exception, no error is found on the part of the trial court in permitting Dr. Eastland, who had heard all the testimony in the case and assumed its truth, excluding all inferences and opinions, to give his opinion as to what effect the matters and circumstances testified to had upon Mrs. Bryant's heart. The witness was an expert on diseases of the heart and moreover had heard lay witnesses describe her encounter with Cain, and her physical and mental reactions subsequent thereto, which continued practically without interruption until her death. Furthermore, he was familiar with Dr. Lipsky's findings as to her condition on the day following her attack. If with that history of the case an expert is not to be permitted to express an opinions, it is difficult to imagine a case in which he could be used. And no misunderstanding could have arisen as to his answer, since the jurors fully understood that the witness, in giving an opinion, assumed the truth of the testimony which he had heard from other witnesses, and if those premises on which his answer was based were not found by them to exist, they could not have failed to understand that Dr. Eastland's opinion had no application. *Quimby v. Greenhawk*, 166 Md. 335, 171 A. 59, and authorities there cited; 22 *C. J.* "Evidence," pages 639-640; *Wigmore's Code of Evidence* (2nd Ed.), sec. 761, page 161; *Wigmore on Evidence*, secs. 678-679.

It is argued that the ruling to which the second exception was taken is erroneous, because the subject of the inquiry, viz: The fair monthly wage of a woman employed as a housekeeper in a home in Anne Arundel County similar to the Bryant home, wherein, in addition to the husband, four infant children were to be cared for in the manner testified by the witnesses, is one of common knowledge which jurors, as men of average intelligence, would from their every day experience in life be qualified to find without the aid of witnesses; that since the testimony indicated to the jurors the nature and scope of Mrs. Bryant's household duties, no evidence was admissible as to the reasonable value of such duties. Undoubtedly situations do arise calling for the application of that rule (*Blinder v. Monaghan,* 171 Md. 77, 87, 188 A. 31; *Anne Arundel County v. State, use of Stansbury,* 107 Md. 210, 216, 68 A. 602, and cases there cited; *Cecil Paper Co. v. Nesbit,* 117 Md. 59, 69, 83 A. 254), but, in our judgment, it could not be properly applied in the present case. The fair and reasonable value of the services rendered in a country home similar to Bryant's depends upon many factors, such as the woman's proximity to the home, the prevailing prices for similar services in the community, and the season of the year. It cannot be said that jurors residing in Baltimore City were, by reason of their experience in the business affairs of life, possessed of any such common knowledge of those factors in Anne Arundel County as to enable them without the aid of some testimony to fix their value. Nor do we find that any error was committed by the trial court in permitting Miss Shank to state the usual and customary wage for a woman employed in a similar service, if she gave the maximum and minimum amounts. The witness had previously testified that she did not set the standards, and in answering that the usual and customary charges for such services varied from maintenance to $18 and $20 per week, she was testifying to facts within her personal knowledge. There is nothing in the answer to mislead the jurors nor influence them

improperly, for as men of ordinary intelligence they are presumed to know that for a man in Bryant's situation to pay the maximum figure which was paid by some employers was an utter impossibility. They may have with more consistency adopted the view that maintenance alone was all that Bryant could afford to pay. It may also be observed that Miss Shank was not subjected to cross-examination by appellant and that the latter offered no evidence whatsoever to contradict her. It cannot, therefore, be said that the testimony which she gave was not without some probative value, and was not an aid to the jurors in assessing the pecuniary loss sustained by the equitable plaintiffs.

By its A prayer, which was refused by the trial court, appellant sought to have the jurors instructed that, notwithstanding their verdict was for the equitable plaintiffs, since the latter had produced no evidence to show they had sustained any pecuniary loss as a result of Hilda Bryant's death, they could not assess any sum whatsoever as damages. Sufficient has been said in discussing the second exception to demonstrate the correctness of the action of the trial court in refusing that prayer, but, apart from that consideration, the instruction could not have been granted, for at most it was self-contradictory. To say to the jurors that their verdict may be for plaintiffs and at the same time instruct them that they can assess no damages is a meaningless and contradictory statement and an utter impossibility.

Appellant's B prayer was also refused. It sought a directed verdict for defendant because no legally sufficient evidence had been produced to entitle the equitable plaintiffs to recover. It is urged that the refusal of that prayer was erroneous, because the evidence is such as to justify us in holding as a matter of law that no causal connection has been shown between the assault of August 12th and Mrs. Bryant's death.

No useful purpose could be served by again reviewing the evidence in detail, but the observation may be made that, prior to being attacked by Cain, Mrs. Bryant was

to all intents and purposes quite able to perform her household duties and had, so far as was known or suspected, been entirely free from illness, but from that date the conclusion is justified that she was unable to perform any of her usual duties; moreover, from that time until her death, she was greatly agitated and upset, and physically infirm. While the physicians attributed the immediate cause of her death to coronary thrombosis, and Dr. Eastland stated it as his opinion that prior to the attack she had suffered from an ailment of coronary origin, he further stated that in his judgment the thrombosis was caused by emotional disturbances occurring at her home at the time of and preceding her death. But it does not follow that, although prior to the attack Mrs. Bryant suffered from a heart ailment, the equitable plaintiffs would thereby be prevented from recovering in the present action upon showing a causal connection between the attack and her death. *Baltimore City Passenger Railroad Co. v. Kemp,* 61 Md. 74; Annotation, 79 *A. L. R.* 351, et seq.; *Rosenburg v. Ambrose,* 129 Md. 418, at pages 428, 429, 99 A. 680; 17 *C. J. "Death,"* pages 1205-1207, sec. 56, and note 73 at bottom of page 1206; Cooley on Torts (4th Ed.), sec. 53.

The jurors were entitled to conclude from Dr. Eastland's evidence that the emotional disturbances in Mrs. Bryant's case were produced by Cain and continued in unbroken sequence until her death. Then too, they were entitled to attach some significance to the undisputed fact that death resulted within so short a time from the date of the attack.

Upon the evidence and authorities to which reference has been made, would this court be justified in holding as a matter of law that no causal connection was shown between the attack and the death? In *Cooley on Torts* (4 Ed.), at pages 120, 121, it is stated: "The question of proximate cause is usually for the jury upon all the facts. Proximate cause is said to be a mixed question of law and fact which must be submitted to the jury

under proper instructions. But where the facts are undisputed and the inferences to be drawn from them are plain and not open to doubt by reasonable men, it is the duty of the court to determine the question as a matter of law."

And from 45 *C. J., "Negligence,"* page 1321, we quote as follows: "Where the proximate cause of an injury depends upon a state of facts from which different minds might reasonably draw different inferences, it is a proper question for the consideration of the jury. On the other hand, where it is equally clear and indisputable beyond any reasonable inference to the contrary that defendant's negligence, or plaintiff's negligence as the case may be, was such proximate cause, the court may so decide without leaving it to the jury to pass upon as an issue of fact. Where, under the testimony, the cause of an accident resulting in a personal injury is conjectural merely, the case should go to the jury."

The principles laid down by those authorities are not at variance with the Maryland rule upon the subject, for as stated by this court in *Baltimore v. Terio,* 147 Md. 330, at page 335, 128 A. 353, at page 355: "The question of proximate cause of injury is in very many cases difficult of determination. It is not a question of science or legal knowledge, as is said in *Milwaukee & St. Paul Railway Co. v. Kellogg,* 94 U. S. 469, 24 L. Ed. 256, but one to be decided upon common sense principles in the light of the surounding facts and circumstances of the case under consideration (*Pennsylvania Steel Co., v. Wilkinson,* 107 Md. 582, 69 A. 412, and, as said by Judge Alvey in *Baltimore & Potomac Railroad Co. v. Reaney,* 42 Md. 136 (137), the 'courts do not indulge in refinements and subtleties, as to causation, that would defeat the claims of natural justice.' The true rule is that what is proximate cause of an injury is ordinarily a question for the jury. It is only when the facts are undisputed, and are susceptible of but one inference, that the question is one of law for the court, and whether it will or will not be a question for the jury will depend upon the

facts of each case. 22 *R. C. L.,* p. 31, and cases cited in note thereto."

It has been shown that in the present case the facts are not undisputed, but it cannot be said that, if the jurors found them to be as testified by witnesses produced on behalf of the equitable plaintiffs, they were insufficient to support a reasonable inference that a causal connection existed between Mrs. Bryant's death and her encounter with Cain one week previously. No error, therefore, was committed by the trial court in refusing that prayer, and we are of the opinion that appellant's first prayer, which was granted, presented the case to the jurors in as favorable light as appellant could ask.

No criticism is made of the plaintiffs' granted prayer, and an examination of that instruction convinces us of its correctness.

*Judgment affirmed, with costs.*