Richard Lee SMITH, et al., Plaintiffs,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**No. Civ.A. AW–99–2187.**

United States District Court, D. Maryland, Southern Division.

Feb. 5, 2001.

---

### MEMORANDUM OPINION

WILLIAMS, District Judge.

Plaintiffs, Richard and Nancy Smith, bring this wrongful death and survival action based upon the fatal heart attack their son suffered while he was climbing an escalator temporarily used as a stairway at a metro station operated by Defendant, the Washington Metropolitan Area Transit Authority ("WMATA"). Plaintiffs claim two million dollars in damages for the Defendant's alleged negligence in having only no ascending escalator available on the day of their son's death. Currently pending before the Court is Defendant's Motion for Summary Judgment [24–1]. The motion has been fully briefed by all parties. On January 30, 2001, the Court held a hearing on the pending motion. Upon consideration of the arguments made in support of, and opposition to, the Defendant's motion, the Court makes the following determinations.

## I. *FACTUAL BACKGROUND*

On July 20, 1998, Plaintiffs' son, Richard Smith, was a metro passenger at the Defendant's Bethesda Metro Station. On that summer day, temperatures rose to over ninety degrees. At the time Mr. Smith attempted to exit the station, two of three station escalators were not in service. On July 8, 1998, the Maryland inspector took one escalator ("escalator number 2") out of service for various safety violations as unfit for public use. On the morning of July 20, 1998, WMATA took the other escalator out of service for repairs ("escalator number 3"). As a result, only one escalator was available for ingress and egress during the rush hour period ("escalator number 1"). With only one properly functioning escalator, Defendant shut down that escalator for use as a stairway for passengers known as a "walker." Described as one of the tallest in the country, the escalator was very steep with a vertical height of approximately 107 feet. One elevator with limited capacity was also available to exiting passengers.

At around 3:00 p.m., Mr. Smith arrived at the Bethesda Metro Station. The station manager claims that he observed Mr. Smith by the crowd awaiting to board the elevator. He, then, observed Mr. Smith going through the line to the escalator. Mr. Smith attempted to exit by climbing the stationary escalator. The station manager stated that, besides Mr. Smith, he observed a few other people attempting to climb the stairs. The station manager noted that, given Mr. Smith's size at 6′1″ and 220 pounds, people noticed his attempt to climb the stairs. The station manager testified that other passengers commented that "he kind of heavy to be doing that. I wouldn't do it" At the top of the stairs, Mr. Smith collapsed and suffered a fatal heart attack. Mr. Smith's autopsy revealed that, at age 37, he suffered from arteriosclerosis, a severe hardening of the arteries. Mr. Smith's heart disease made him susceptible to a heart attack upon a certain level of overexertion. Apparently, Mr. Smith knew his cholesterol level was high, but was unaware of his heart disease.

## II. *DISCUSSION*

### A. *Legal Standard*

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir.1993); *Etefia v. East Baltimore Comm. Corp.*, 2 F.Supp.2d 751, 756 (D.Md.1998). For the purposes of summary judgment, a genuine dispute exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 of the Federal Rules of Civil Procedure provides that the entry of summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393 (4th Cir.1994).

In reviewing a motion for summary judgment, the court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citations omitted). While the evidence of the nonmovant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330–31 (4th Cir.1998). The party opposing summary judgment must present evidence

of specific facts from which the finder of fact could reasonably find for him or her. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Nevertheless, the moving party ultimately bears the burden of demonstrating the absence of all genuine issues of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *Negligence*

■ Plaintiffs appear to assert a number of theories of negligence. As a case brought before the federal court under its diversity jurisdiction, the substantive laws of the forum state, Maryland, apply. *See, e.g., Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Maryland recognizes the traditional elements for establishing a claim for negligence: (1) the existence of a duty owed to the plaintiff by the defendant; (2) the defendant's breach of that duty, (3) the breach was the proximate cause of the harm suffered by the plaintiff; and (4) actual damages suffered by the plaintiff. *See Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756 (1986). "[A] party who has the burden of proving another party guilty of negligence cannot sustain this burden by offer a mere scintilla of evidence, amounting to no more that surmise, possibility, or conjecture...." *Fowler v. Smith,* 240 Md. 240, 247, 213 A.2d 549 (1965).

■ Thus, the first question is whether WMATA owed a duty to the Plaintiffs' son as a metro passenger. In *Jacques v. First Nat'l Bank,* the Maryland Court of Appeals stated that "[i]n determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." 307 Md. at 534–35, 515 A.2d 756. In *Village of Cross Keys, Inc. v. U.S. Gypsum Co.,* 315 Md. 741, 752, 556 A.2d 1126, 1131 (1989) (quoting *Tarasoff v. Regents of University of California,* 17

Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976)), the court added that

> among the variables to be considered in determining whether a tort duty should be recognized are: [T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

"[A] duty is readily found if it appears highly likely that the conduct in question should have brought about the harm." *B.N. v. K.K.,* 312 Md. 135, 142, 538 A.2d 1175 (1988). A duty will be imposed if "the actual harm fell within a general field of danger which should have been anticipated." *Segerman v. Jones,* 256 Md. 109, 132, 259 A.2d 794 (1969) (quoting *McLeod v. Grant County Sch. Dist.,* 42 Wash.2d 316, 255 P.2d 360, 363 (1953)). However, where the occurrence of the injury is highly extraordinary, the law will not impose liability. *Id.* at 141, 259 A.2d 794. Before imposing a duty to prevent a particular consequence, the court must also consider the burdens to both the defendant and the community of imposing the duty against the social benefits flowing from charging the defendant with the duty. *See Valentine v. On Target, Inc.,* 112 Md.App. 679, 686 A.2d 636 (1996).

■ It is well recognized that a common carrier owes a duty to its passengers to provide a safe means of ingress and egress from its station premises. *Washington Metropolitan Area Transit Authority v. Reading,* 109 Md.App. 89, 674 A.2d 44 (1996); *Kaplan v. Baltimore & O.R. Co.,* 207 Md. 56, 113 A.2d 415 (1955); *Ortiz v. Greyhound Corp.,* 275 F.2d 770 (4th Cir.1960). "[A] common carrier, such as

WMATA, is obligated to use the highest degree of care that is consistent with its mode of transport to ensure the safety of its passengers." *Reading*, 109 Md.App. at 100, 674 A.2d at 49. "When a carrier has reason to anticipate the gathering of a large crowd at a station, it is bound to take such reasonable precautions as the condition to be anticipated may dictate to avert injury to a passenger by the rushing or crowding of the persons thus assembled." *Dilley v. Baltimore Transit Co.*, 183 Md. 557, 562, 39 A.2d 469, 471 (1944). Here, it is undisputed that, by design, the escalators were the primary means for metro passengers to exit the station, "so that no alternative easily accessible steps were provided." (Def.Mot.Summ.J. at 24) The Bethesda Metro Station was regularly subject to heavy foot traffic during the evening rush hour. Therefore, WMATA had reason to anticipate a large crowd at the time in which no escalator was operating. WMATA owed a duty to its passengers to take reasonable measures to facilitate the exiting of passengers by keeping the primary avenue for egress (the escalators) in good repair and functioning or providing an alternative outlet that could reasonably accommodate the crowd of exiting passengers.

In the instant case, on a hot day with temperatures exceeding ninety degrees during the evening rush hour, Defendant provided its passengers two means to exit the station, the escalator used as a ten-story stairway and an elevator with limited capacity. The "walker" escalator was used for both entering and exiting traffic. The elevator could only carry nine passengers every 2.5 minutes or an average of 216 persons per hour. Defendant acknowledges the use of the elevator as the primary means of ingress and egress as creating "a potentially hazardous situation as patrons squeeze forward to use an elevator not designed for continuing use by large crowds...." (Def.Mot.Summ.J. at 24.). It is undisputed that, at the time Plaintiffs' son attempted to exit from the Bethesda station, the station was servicing a large number of passengers. William Ford, the station manager, described the conditions as "hectic" and "crowded." Plaintiffs' expert, Jake Pauls estimates that an average of 628 people per hour attempted to exit the Bethesda Metro Station during the evening rush hour. (Pl.'s Opp'n Mot. Summ.J., Ex. A at 11).

Defendant contends that, due to circumstances beyond its control, it could not avoid shutting down all of the escalators. Defendant argues that escalator 2 could not have been returned to active service for any purpose until the state escalator inspector approved its return. Plaintiffs counter that, if Defendant had performed adequate inspections and repairs, there would have been no need for the escalator to be taken out of service in the first place. According to WMATA, the state inspector made an abrupt change in position and ordered that the escalator be barricaded. WMATA maintains that it was customary for the state inspector to allow escalators taken out of service for safety violations to be used as "walkers" until certification. WMATA urges that it could not have anticipated that the state inspector would not allow the escalator to be used as a "walker." However, the Maryland Code specifically gives the state inspector the authority to prevent the continued operation of escalators that are safety hazards. *See* Md.Code Ann.1957, Art. 89, s 49B(h); Labor and Employment, § 5–210 (1998). WMATA acknowledges that the Chief Elevator–Escalator Inspector of Maryland had definitively stated that it was a violation to use metro station escalators as "walkers." [1] Regardless of WMATA's beliefs as to the merits and legal effect of that opinion, WMATA can hardly claim

---

1. On September 28, 1998, the Chief Elevator–Escalator Inspector stated "it has always been this division's view that if an escalator is not running it should not be used as stairs allowing individuals to access and egress...." Division of Labor and Industry, Field Directive 98.2 (Sept. 28, 1998).

that they were "surprised" by the state inspector's enforcement of the Chief Elevator–Escalator Inspector's position on the use of escalators as "walkers." Defendant's own expert, Robert L. Seymour, stated "I personally have a problem with escalators as walkers because of the difference of risers, the sharpness of the steps, the construction of the steps." (Seymour Dep. at 30.)

Plaintiffs also note that, even if escalator 2 could not have been used as a descending stairway, Defendant breached its duty of care in removing escalator 3 from service. According to Plaintiffs, if escalator 3 was used as a descending stairway, escalator 1 could have been properly used as an ascending means to exit without the exertion of climbing 160 oversized steps. Defendant counters that the nature of repairs on escalator 3 made returning it to service impracticable and potentially unsafe. Plaintiffs also posit that Defendant could have employed a device used to assist the handicapped when the elevator at a station is out of service in order to alleviate the crowded conditions at the metro station. Under this protocol, an audio announcement on the trains alerts passengers that elevator service is not available beforehand and that shuttle bus service from a nearby station is available.

■ Under these circumstances, the Court finds that a reasonable jury could conclude that Defendant had a duty to provide a reasonable passage for exiting the station that would reasonably accommodate the growing crowd of passengers. Given the extreme weather conditions that day and the uniquely steep construction of the escalator, one cannot say that, as a matter of law, Defendant took appropriate measures consistent with its duty of care owed to its passengers. "It is for the jury to determine whether the defendant was guilty of negligence by considering the care and precautions which should have been taken by it." *Dilley*, 183 Md. at 563, 39 A.2d at 472. Plaintiffs have produced sufficient evidence to raise a genuine dis-

pute as to whether Defendant breached a duty of care owed to Mr. Smith by failing to take appropriate precautionary measures to guard the safety of passengers attempting to exit the station.

### a. *Proximate Cause*

As part of their burden, Plaintiffs must also establish that WMATA's alleged breach of its duty of care proximately caused their son's injury. In *Baltimore Gas And Electric Co., v. Lane*, 338 Md. 34, 51, 656 A.2d 307 (1995), the Maryland Court of Appeals held that the proximate cause element is "satisfied if the negligence is 1) a cause in fact of the injury and 2) a legally cognizable cause." There is no dispute that the exertion of climbing the steep stationary escalator was a cause-in-fact of Mr. Smith's ensuing heart attack. The close temporal nexus between Mr. Smith's climb and his collapse from the heart attack evidence that issue. Thus, the primary issue centers on whether the absence of an ascending escalator constitutes a legally cognizable cause of Mr. Smith's death.

In assessing whether conduct amounts to a legally cognizable cause of the plaintiff's injury, Maryland case law instructs the Court to consider notions of fairness and social policy and "principles of common sense in light of surrounding facts and circumstances." *Taylor v. Feissner*, 103 Md.App. 356, 366, 653 A.2d 947 (1995); *see Lane*, 338 Md. at 51, 656 A.2d 307. However, the determination as to whether the injury was foreseeable is a question of fact confined to the discretion of the trier of fact. *See Lane*, 338 Md. at 51, 656 A.2d 307. " '[N]egligence is the proximate cause of an injury when the injury is the natural and probable result or consequence of the negligent act or omission.' " *Bell v. Heitkamp, Inc.*, 126 Md.App. 211, 222, 728 A.2d 743, 748 (1999) (quoting *Medina v. Meilhammer*, 62 Md.App. 239, 247, 489 A.2d 35 (1985)). Even assuming that WMATA had a duty to have at least one ascending escalator functioning at the

metro stop, the Plaintiffs must show that their son's heart attack was a natural and probable consequence of WMATA's failure to provide an ascending escalator.

One Maryland court has addressed the issue of whether a defendant may be liable in tort when its conduct precipitates the death of the plaintiff by aggravating a pre-existing cardiovascular condition. In *Industrial Service Co. v. State*, 176 Md. 625, 629, 6 A.2d 372, 374 (1939), a lender's agent harassed and physically assaulted the decedent as part of his collection tactics. Several days after the incident, the decedent died of a heart attack. *Id.* at 631, 6 A.2d 372. The medical testimony revealed that the victim's pre-existing coronary ailment was aggravated by the agent's attack leading to her heart attack. *Id.* at 632–33, 6 A.2d 372. The Maryland Court of Appeals held that a reasonable jury could find a causal connection between the decedent's death and the agent's conduct based upon the medical testimony and the close temporal proximity between the physical assault and the fatal heart attack. *Id.* at 637–38, 6 A.2d 372.

Courts in other jurisdictions have similarly found that a sufficiently triable issue exists when a defendant's conduct accelerates the occurrence of a heart attack by aggravating the pre-existing heart condition of the plaintiff. See *Sumpter v. City of Moulton*, 519 N.W.2d 427, 434–35 (1994); *Bailey v. Missouri Pac.R. Co.*, 383 So.2d 397, 402 (1980). In *Sumpter v. City of Moulton*, the Iowa court found that a city's failure to clean ditches could reasonably have been the proximate cause of a heart attack suffered by a property owner attempting to clean the public ditches adjacent to his property. 519 N.W.2d at 435. The court noted that "[t]he heart attack may have been inevitable, but the omission by the city may have aggravated [the plaintiff's] condition and hastened the process." 519 N.W.2d at 433. Consequently, the court could not "conclude as a matter of law that some injury was not reasonably foreseeable from the failure to maintain the ditches." *Id.*

In *Bailey v. Missouri Pac. R. Co.*, the defendant ordered the plaintiff to perform strenuous labor in the summer heat. 383 So.2d at 399. Working under the onerous conditions, the plaintiff collapsed from a heat stroke and subsequently suffered a heart attack. *Id.* The defendant argued that the plaintiff's heart attack was unforeseeable because the plaintiff's arteriosclerotic condition was unknown at the time of the incident. *Id.* at 402. The court responded that, in order for a defendant to be liable for consequential damages, he need not necessarily foresee the particular consequences of his negligent acts. *Id.* The court found that the foreseeable risk of harm in this case was exposure to heat stroke or a collapse. Id. As the heart attack was a' consequence of the increased strain on the plaintiff's heart aggravated by the heat stroke and the plaintiff's pre-existing condition, the court affirmed the finding of negligence. *Id.*

In the present action, the Defendant offered a ten-story stairway as an exit from the station on a summer day when temperatures exceeded ninety degrees. It is undisputed that the 107–foot stairway offered no landing for resting. As discussed earlier, the only other alternative exit, the elevator, was drastically ill-equipped to handle the large number of passengers frequenting the station at the time of Mr. Smith's collapse. The elevator had a maximum capacity of 216 persons per hour at the time when possibly 628 people were attempting to exit the station. A jury could reasonably believe that the crowded and hectic conditions at the station made selecting the elevator an arduous, and potentially dangerous, undertaking. Under these circumstances and drawing all reasonable inferences in favor of Plaintiffs, a reasonable jury could conclude that it was foreseeable that passengers would take Defendant's invitation to exit the station by climbing the stairs. According to Dr. Mitchell Krucoff, Plain-

tiff's medical expert, the combination of the high temperature and the extraordinary exertion of climbing the metro station escalator created sufficient stress on Mr. Smith to aggravate his heart disease and hasten the occurrence of the fatal heart attack. However, Dr. Krucoff states that ordinary walking or climbing a small number of stairs would not have been sufficient to cause Mr. Smith's death. Given the totality of the circumstances surrounding Mr. Smith's death, one cannot say that, as a matter of law, a passenger's collapse and subsequent heart attack could not be a natural and probable consequence of the exertion of climbing one of the tallest escalators in the nation in ninety degree weather. Accordingly, the Plaintiffs have made a sufficient showing of proximate cause for purposes of summary judgment. The proof of damages is not in dispute and is apparent. Accordingly, the Courts concludes that Plaintiffs produced sufficient evidence to survive summary judgment.

### C. *Use of a Statute as Evidence of Negligence.*

As further evidence of WMATA's negligence, Plaintiffs refer to purported violations of the A17.1 code as published by the American National Safety Institute ("ANSI") and the American Society of Mechanical Engineers ("AMSE"). The A17.1 handbook states that "[t]he use of a stationary escalator as a stairway is a violation of building codes." (Seymour Dep. at 24 (quoting Edward A. Donoghue, American Society of Mechanical Engineers, *The A17.1 Handbook* 319 (1996))). Plaintiffs' expert, Mr. Pauls, interprets this provision to state that the use of escalators as "walkers" is contrary to national safety standards and in violation of the A17.1 code. Mr. Paul's interpretation is consistent with the opinion of the Chief Elevator–Escalator Inspector as expressed in field directive 98.2. Field Directive 98.2 states that "[b]y virtue of [the definition of stair], it has always been this division's view that if an escalator is not running it should not be used as stairs allowing individuals to access and egress the various structural levels." (Seymour Dep. at 25) (quoting Division of Labor and Industry, Field Directive 98.2. (Sept. 28, 1998)). In response, Defendant's expert emphasizes that the handbook is not the A.17 code and, thus, is not an enforceable document. Defendant also maintains that the opinion of the Chief Elevator–Escalator Inspector is without force of law.

■ In Maryland, the violation of a statute may serve as evidence of negligence, but does not constitute negligence per se. *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 155, 642 A.2d 219 (1994); *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 362, 517 A.2d 1122 (1986). "It is the rule in [Maryland] that the mere violation of a statute or ordinary negligence will not support an action for damages, even though it may be evidence of negligence, unless there is legally sufficient evidence to show that the violation was the proximate cause of the injury." *Austin v. Buettner,* 211 Md. 61, 70, 124 A.2d 793 (1956). Where the plaintiff relies on the violation of a statute as proof of negligence, "[p]roximate cause is established by determining whether the plaintiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent." *Brown v. Dermer,* 357 Md. 344, 359, 744 A.2d 47 (2000); *see also Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232 (1991); *Atlantic Mut. Ins. Co. v. Kenney,* 323 Md. 116, 124, 591 A.2d 507 (1991).

The ANSI A17.1 code is the model escalator and elevator safety code. The Maryland Code provides that "[a]ll new and existing elevators, dumbwaiters, escalators, and moving walks shall be inspected, tested and maintained in a safe operating condition in accordance with the American National Standard Safety Code for elevators, dumbwaiters, escalators, and moving walks, known as ANSI A17.1–1971, and all subsequent amendments and revisions to it, as adopted by the Commissioner, and

any rules and regulations as may be adopted by the Commissioner." Md.Code Ann.1957, Art. 89, § 49B (1998). The implementing regulations on escalator safety state: "The ASME A17.1–1996 Safety Code for Elevators and Escalators, ..., is incorporated by reference and is effective April 6, 1998." Md.Regis.Code tit. 09, § 12.81.01(1) (2000).

Defendant's expert correctly states that the handbook is not the code. The A.17 Handbook appears to be an interpretive publication by a recognized expert in the field. However, courts "often look to the legislative history, an agency's interpretation of the statute, and other sources for a more complete understanding of what the General Assembly intended when it enacted particular legislation." *Adamson v. Correctional Medical Services, Inc.,* 359 Md. 238, 251–52,753 A.2d 501, 508 (2000). *See also Jefferson v. Jones,* 286 Md. 544, 548, 408 A.2d 1036, 1039 (1979) ("While [the U.C.C. comments] are not controlling authority and may not be used to vary the plain language of the statute, they are an excellent place to begin a search for the legislature's intent when it adopted the Code."); *State v. Tibor,* 373 N.W.2d 877, 882 n. 6 (1985) ("When a statute is derived from the Model Penal Code we may look to the comments from the relevant sections for insight into the meaning and application of the statute."); *Rescigno v. Picinich,* 151 N.J.Super. 587, 377 A.2d 733, 738 (1977) ("The treatise of the draftsman of legislation is an extrinsic interpretative aid of considerable weight."). It is undisputed that Mr. Donaghue is a recognized expert in building codes. The ASME publishes both the A.17 handbook and the ANSI standards. Consequently, the A.17 Handbook may assist the Court in interpreting the A.17 code as adopted by the Maryland legislature.

■ Under the Maryland Code, the Commissioner of the Department of Labor, Licensing and Regulation may delegate its duties and functions under the elevator and escalator code to the Chief Elevator–Escalator Inspector. *See* Md. Code Ann., Art. 89, § 49B(1) (1998). Therefore, under such delegation, the Chief Inspector is empowered to enforce the elevator and escalator safety code to the extent authorized by the Commissioner. The Maryland Court of Appeals has stated that "the question whether a particular regulation of an administrative official is arbitrary or unreasonable, or not fairly within the scope of the delegated power, is subject to judicial review; but if the matter is fairly debatable, the court should not substitute its judgment for the judgment of the administrative official who is charged with the duty of promulgating the regulation." *Pressman v. Barnes,* 209 Md. 544, 553, 121 A.2d 816, 821 (1956). "The modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases." *Pressman,* 209 Md. at 555, 121 A.2d at 822. Although the field directive does not appear to be a formally promulgated regulation, it is an interpretation of the code and regulations that the Chief Elevator–Escalator Inspector was charged with administering. *See Board of County Com'rs v. Milstead,* 258 Md. 477, 489, 265 A.2d 879, 884 (1970) (finding administrative order was valid exercise of delegated authority by the Director of the Department of Fire). "[C]ourts give significant weight to the agency's interpretation of the statute that it is required to administer." *Adamson,* 359 Md. at 266, 753 A.2d at 516. As the Chief Inspector's prohibition on the use of escalators as stairway does not conflict with the statute, the Court defers to the agency interpretation. *See Controller, Anne Arundel County v. Pleasure Cove Yacht Club, Inc.,* 334 Md. 450, 466, 639 A.2d 685, 693 (1994) ("[A]dministrative construction is entitled to considerable weight."). The prohibition recognizes legitimate safety concerns flowing from the use of escalators as stairways, such as the differences in construction. Furthermore,

the record indicates that the opinion of the Chief Elevator–Escalator Inspector is still in effect as, subsequent to the accident, WMATA secured a waiver from the prohibition on the use of escalators as walker. Accordingly, the Court concludes the opinion of the Chief Inspector as to the interpretation of the elevator and safety code provides a sufficient basis for establishing a statutory violation.

■ As a passenger exiting the Defendant's metro station, the Plaintiffs' son was obviously a member of the class sought to be protected by the escalator and elevator safety code. Nevertheless, even assuming the ANSI standards, as interpreted by Plaintiff's expert and the Chief Inspector, represent the statutory standard of care and the Bethesda Metro station housed several violations, Plaintiffs must establish that each cited provision was adopted to prevent the type of harm suffered by their son. Section 49B was enacted for the purpose of making the requirements of the ANSI code applicable to "elevators, dumbwaiters, escalators, and moving walks only to the extent the requirements are adopted by the Commissioner of Labor and Industry." Plaintiffs' expert discusses at length the inadequacies in the lighting and the placing of signs in the station according to the ANSI codes. Yet, there is no evidence that the injury suffered by Mr. Smith (a heart attack) was the type of harm to be protected by the statute. Similarly, the prohibition on the use of escalators as walkers, as suggested by Plaintiffs, would appear to apply equally to the shortest escalator in the WMATA system as well as the longest. Plaintiffs have not proffered evidence supporting any logical connection between subjecting passengers to the type of overexertion that could precipitate a heart attack and the alleged violations of the A.17 code. Under the current record and drawing all reasonable inferences in their favor, Plaintiffs have not sustained their burden of showing that the injury suffered by their son was of the kind contemplated by the legislature in adopting the A.17 code. Therefore, as a matter of law, Plaintiffs have not shown the alleged violations proximately caused their son's death, and an action for damages may not lie based upon the theory of a statutory violation.

## D. Scope of WMATA Immunity

The final issue before the Court is whether WMATA is immune to Plaintiff's negligence claim. The WMATA compact insulates the Defendant from liability for governmental actions. The WMATA provides, in pertinent part, that

> The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.

D.C.Code § 1–2431(80). Maryland is a signatory to the WMATA Compact. Therefore, the Court must address whether Plaintiffs' cause of action falls within the ambit of WMATA's immunity. The Fourth Circuit has recognized that Section 80 of the WMATA Compact confers immunity to WMATA for governmental functions, but has not addressed what acts qualify as governmental functions under the WMATA Compact. *See Hill v. Washington Metropolitan Area Transit Authority*, 816 F.2d 672 1987 WL 37096 at *2 (4th Cir.1987) (unpublished decision) (affirming district court's finding of negligence for bus driver's failure to pull completely off the highway). The District of Columbia Circuit has construed the scope of immunity granted to WMATA under the Compact to be a question of federal law. *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1216 (D.C.Cir.1997). In determining the scope of the federal immunity, the Court of Appeals looked to the construction of governmental immunity under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 1346(b). 112 F.3d at

1216. "The liability of the United States under the FTCA is limited by the discretionary function exception[, 28 U.S.C § 2680(a) ]." *Williams v. United States,* 50 F.3d 299, 308 (4th Cir.1995). In *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991), the Supreme Court outlined the proper considerations to determine what conduct fell within the scope of governmental immunity under the discretionary exception of the FTCA. The Court stated that "the exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" 499 U.S. at 322, 111 S.Ct. at 1273 (quoting *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" 499 U.S. at 322, 111 S.Ct. at 1273 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958–59). "[E]ven 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" 499 U.S. at 322–23, 111 S.Ct. at 1273 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958–59). The exception applies to those decisions which viewed objectively one "would expect inherently to be grounded" in considerations of economic, social, or political policy. *Baum v. United States,* 986 F.2d 716, 721 (4th Cir.1993). Essentially, the focus is on whether the actor's conduct is "of the nature and quality that Congress intended to shield from tort liability.'" *Williams,* 50 F.3d 299, 309 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984)).

■ Therefore, WMTA is immune to suit for discretionary actions, such as hiring and firing metro employees or the design, construction, and location of its facilities and instrumentalities. *See Burkhart,* 112 F.3d at 1216; *Souders v. WMATA,* 48 F.3d 546, 548 (D.D.C.1995). "WMTA, however, can be liable for a broad range of conduct which implements its discretionary decisions." *Beatty v. WMATA,* 860 F.2d 1117, 1127 (D.C.Cir. 1988); *see also Gillot v. WMATA,* 507 F.Supp. 454, 457 (D.D.C.1981) (finding that WMATA's failure to take adequate security precautions for the safety of its patrons using its parking lot was not protected by immunity). The District of Columbia Circuit has drawn a distinction between tort claims subject to immunity and those where liability may lie. In *Beatty,* the plaintiff sued for nuisance based upon the damage to her home caused by the vibrations generated by passing metro trains. 860 F.2d at 1119. The plaintiff alleged that the damage resulted from WMATA's failure to lay the tracks for the trains according to its own guidelines. *Id.* The Court found that the grant of summary judgment was improper as "a genuine issue of fact existed as to whether the alleged nuisance resulted from a governmental ("design") or proprietary ("implementation") function." *Souders,* 48 F.3d at 550 (interpreting *Beatty* ). In *Souders v. WMATA,* the plaintiff sued for nuisance because the noise of the trains exceeded the maximum decibels allowed under the local noise control ordinance. 48 F.3d at 548. However, under the established WMATA policy, the noise levels of the trains did not justify the erection of a sound barrier. *Id.* at 549. Thus, the *Souders* Court found that the decision not to install a sound barrier pursuant to that policy was protected by immunity. *Id.* at 550.

In the present case, Plaintiffs do make allegations citing faulty design based upon the alleged statutory violations of the ANSI code as incorporated by the Maryland elevator and escalator safety code. As discussed earlier, the Court has found the Plaintiffs may not base their claims on

the alleged statutory violations due to the lack of proximate cause. As such, the Court need not address the question of whether WMATA is immune to suit for injuries caused by the alleged statutory violations.[2] As to the existence of a policy on the subject matter, this case is particularly unique because WMATA's sovereign immunity is derived from Maryland and the other signatories to the Compact. The Chief Elevator–Escalator Inspector did specifically proscribe the use of station escalators as walkers. In fact, escalator 2 was barricaded because the state inspector refused to permit its use as a walker. Thus, a question arises as to what role the state directive has in determining whether WMATA had a legitimate element of judgment or choice in using escalator 1 as a walker. The available precedent indicates that the existence of a *federal* statute, regulation, or policy is needed to dispense with the immunity question. *Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1273; *Souders*, 48 F.3d at 550. Thus, it appears the state directive has no effect on the availability of immunity. It is undisputed that, at the time of the incident, WMATA had no formal policy or directive in place establishing procedures for ingress and egress when none of the escalators at a station are operating. Consequently, WMATA's claim of immunity rests upon establishing that the decisions affecting the maintenance and repair of the primary means of ingress and egress from the station qualifies as a judgment based on considerations of public policy.

The Fourth Circuit has not expressly addressed the issue before the Court. In *Baum v. United States*, the court held that "the decision of how and when to replace a major element of a substantial public facility is, like decisions involving design and construction, .... inherently bound up in

considerations of economic and political policy...." 986 F.2d 716, 724 (4th Cir. 1993). However, the court also stated that not "every maintenance decision of every government actor is so policy-based as to fall within the discretionary function exception" limiting its holding to the facts of the case. *Id.* Under the facts of that case, there was no suggestion of deterioration, rather the plaintiff argued for outright replacement of a guardrail. *Id.* at 723 n. 3. Thus, the court concluded that "there is really no question as to maintenance, the [alleged] fault, if any, was in design and construction." *Id.* Similarly, in *Bowman v. United States*, 820 F.2d 1393, 1394 (4th Cir.1987), the plaintiff challenged a decision implicating the design and construction of a national highway specially designed for sightseeing and leisure driving.

In the present case, Plaintiffs make concrete allegations of WMATA's failure to maintain and repair the existing escalators used as the primary means for accessing and exiting the Bethesda metro station. The Court believes that this case presents the type of situation to which Congress and the signatories to the WMATA Compact intend to waive immunity. The duty of a common carrier to provide a safe means of ingress and egress is widely recognized. This is particularly true in the instance of an underground railway where the common carrier controls the avenues of entrance and exit. The passengers cannot tunnel out of the ground on their own. They are confined to the routes the carrier provides. The Court believes that maintaining and repairing the existing instrumentalities of ingress and egress from the premises of a common carrier is not the type of decision inherently grounded in regulatory, economic, or social policy. Others courts have similarly found that the discretionary exception does

---

**2.** Although the Court notes that the existing precedent indicates that the decisions with respect to making the station escalators the primary means of accessing and exiting the station, as well as lighting and the placing of signs, are design decisions that inherently invoke considerations of public policy to which WMATA would be immune from suit. *See Baum v. United States*, 986 F.2d 716, 721–22 (4th Cir.1993); *Dant v. District of Columbia*, 829 F.2d 69 (D.C.Cir.1987),

not apply to the failure to properly maintain and repair existing facilities that are intended for public use. *See Gotha v. United States,* 115 F.3d 176, 181–82 (3d Cir.1997); *Dant v. District of Columbia,* 829 F.2d 69, 75 (D.C.Cir.1987) (finding that faulty maintenance and operation of fare collection machines was not included within the scope of WMATA immunity); *Wainwright v. WMATA,* 903 F.Supp. 133, 140 (D.D.C.1995) (concluding that failure to maintain station escalator was not within the scope of WMATA immunity); *Arkansas River Co. v. CSX Transportation,* 780 F.Supp. 1138, 1140–41 (W.D.Ky.1991). Accordingly, the Court finds that Plaintiff's negligence claims for failure to maintain and repair the escalators is not barred by WMATA's immunity under the WMATA Compact.

### III. *CONCLUSION*

In conclusion, Plaintiffs have produced sufficient evidence to create a triable issue as to Defendant's liability for ordinary negligence. However, Plaintiffs have not sustained their burden to show that the alleged statutory violations proximately caused Mr. Smith's heart attack. Furthermore, the alleged design defects in the metro stations falls within the scope of WMATA's grant of immunity. Nonetheless, the heart of Plaintiff's complaint is the failure to repair and maintain the primary means of ingress and egress from the station's premises. The Court concludes that this conduct does not fall within the scope of WMATA's immunity. For the reasons stated above, the Court denies Defendant's motion for summary judgment. An Order consistent with this Opinion will follow.