Vacated and remanded by published opinion. Judge KING wrote the opinion, in which Judge GREGORY joined. Judge MICHAEL wrote an opinion concurring in part and dissenting in part.
OPINION
KING, Circuit Judge.
In July 1999, the parents of Richard Hadaway Smith, individually and as representatives of his estate, initiated this proceeding against the Washington Metropolitan Area Transit Authority (the “METRO”) in the District of Maryland, seeking damages for the death of their son. In response, the METRO asserted governmental immunity and, upon the court’s partial denial of its immunity claim, noticed an interlocutory appeal. Because the METRO is entitled to a broader grant of immunity than that accorded it by the district court, we vacate and remand.
I.
A.
On the afternoon of July 20, 1998, at the METRO’S Bethesda station in Maryland, Smith climbed an escalator which was being utilized as a stairway, i.e., a “stationary walker.”[1] At the top of the escalator, Smith suffered a fatal heart attack. The METRO had decided to utilize the escalator as a stationary walker on that occasion because the two other escalators at its Bethesda station were inoperative.
Public access to the Bethesda station is normally provided by three escalators and an elevator. By design, each of the three escalators is capable of being operated either up or down, and the direction of each *204 escalator can be altered by METRO officials on the basis of need. On July 8,1998; twelve days before Smith’s tragic death, one of the escalators at the Bethesda station (“Escalator Two”) had failed an inspection by Maryland safety inspectors. A safety inspector thereafter refused to allow the METRO to utilize Escalator Two as a stationary walker, and it was inoperative on July 20, 1998. On the night of July 19, 1998, while the Bethesda station was closed, a second escalator (“Escalator Three”) was being subjected to routine maintenance when METRO mechanics discovered a problem necessitating its repair. This problem rendered Escalator Three potentially unsafe for the METRO to operate, and on July 20, 1998, Escalator Three was in a state of disassembly awaiting a replacement part.
As a result of the inoperative status of Escalators Two and Three, the METRO made the decision to utilize its sole operating escalator (“Escalator One”) as a stationary walker, thus enabling its patrons to both enter and exit the Bethesda station by a means other than the single elevator. Smith’s fatal heart attack occurred at approximately 3:15 p.m. on July 20, 1998.[2]
B.
This proceeding was initially filed in the district court on July 22, 1999, alleging that, due to its negligence, the METRO is liable for Smith’s death. An amended complaint, filed August 15, 2000, consisted of two counts, each premised on the same allegation of negligence: one for wrongful death, made on behalf of Smith’s parents, plus a second count under the Maryland survival statute, asserted on behalf of Smith’s estate.[3]
In response to this allegation, the METRO sought summary judgment on the basis of multiple contentions, including the immunity claim now on appeal. The development of the case in district court revealed that Smith’s negligence allegation concerning the Bethesda station embodied five theories, as follows:
1. The METRO had negligently braked Escalator One for use as a stationary walker;
2. The METRO had negligently left Escalator Three disassembled pending repair; .
3. The METRO had negligently failed to warn its Bethesda patrons of the conditions on July 20,1998;
4. The METRO’S signage and illumination (the alleged “design defects”) failed to comply with the requirements of the ANSI Code; [4]
5. The METRO had negligently failed to repair and maintain Escalators Two and Three.
Upon its consideration of the METRO’S summary judgment request, and the assertions and related submissions of the par *205 ties on the legal and factual issues relating thereto, the district court declined to resolve the case fully in favor of the METRO. Smith v. Washington Metro. Area Transit Auth., 133 F.Supp.2d 395 (D.Md.2001) (the “Opinion”). It concluded, inter alia, that the METRO’S alleged failure to repair and maintain its escalators was not within its immunity protection. The court determined, however, that the METRO was entitled to immunity for the design of signage and illumination at its Bethesda station, which was alleged to violate the ANSI Code. The court also ruled in favor of the METRO on what it called the “alleged statutory violations” because Smith had failed to forecast sufficient evidence to warrant the conclusion that violations of the ANSI Code had proximately caused his death. The METRO has appealed the court’s decision declining to fully recognize its immunity claim in this case.
C.
It is settled that the denial of an immunity claim by a district court constitutes an appealable interlocutory decision. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); KiSKA Constr. Corp.-U.S.A. v. WMATA 167 F.3d 608, 610-11 (D.C.Cir.1999). In this case, the court partially rejected the METRO’S immunity claim, and “[w]hen the ‘defendant raises and the district court rejects immunity as a defense, the defendant enjoys the right of immediate appeal.’ ” KiSKA, 167 F.3d at 610 (quoting Rendall-Speranza v. Nassim, 107 F.3d 913, 916 (D.C.Cir.1997)).
To the extent the METRO’S complained-of actions fall within its cloak of immunity, we lack subject matter jurisdiction over such claims. See, e.g., Medina v. United States, 259 F.3d 220, 223 (4th Cir.2001). In 1995, we observed that an assertion of governmental immunity is properly addressed under the provisions of Rule 12(b)(1) of the Federal Rules of Civil Procedure.[5] Williams v. United States, 50 F.3d 299, 304 (4th Cir.1995). As we noted, if the governmental entity challenges jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of persuasion, and the court is free to consider exhibits outside the pleadings “to resolve factual disputes concerning jurisdiction.” Id.
In this instance, the district court partially denied the METRO’S immunity claim, thereby deciding that it possessed subject matter jurisdiction over Smith’s causes of action. On interlocutory review of such an immunity denial, we do not decide whether a plaintiff can prove his claim at trial. Rather, we must examine whether any material jurisdictional fact is in dispute, and if not, whether the governmental entity “is entitled to prevail as a matter of law” due to our lack of jurisdiction. Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 769 (4th Cir.1991).
II.
A.
In order to properly assess the METRO’S claim of immunity, it is necessary to first understand certain legal principles governing the METRO’S operations. First of all, the METRO Compact (the *206 “Compact”) was executed in 1966 by the State of Maryland, the Commonwealth of Virginia, and the District of Columbia, creating an independent entity to operate a mass transit system in and about the District of Columbia. Congress specifically consented to the Compact, and any .legal issues relating to its interpretation are federal questions. Cuyler v. Adams, 449 U.S. 433, 438, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981); Morris v. WMATA, 781 F.2d 218, 220 (D.C.Cir.1986).
As a general proposition, multistate entities such as the METRO are not accorded governmental immunity absent some “good reason to believe” that immunity was intended to be conferred upon them. Morris, 781 F.2d at 224 (quoting Lake Country Estates v. Tahoe Reg’l Planning Agency, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)). The Compact, however, evinces the clear intent of its signatories to effect such a conferral. Morris, 781 F.2d at 220. Pursuant to its Section 80, the METRO has waived immunity in certain circumstances, i.e., when it is engaged in proprietary functions, while specifically preserving its immunity for “torts occurring in the performance of a governmental function.”[6]
B.
As a threshold question, we must examine the legal framework to be utilized in assessing the immunity issue. While we have previously applied the traditional “governmental/proprietary” distinction to the METRO, we have also recognized the difficulty in determining when a particular function is a proprietary one.[7] Martin v. WMATA, 667 F.2d 435, 436 (4th Cir.1981). In analyzing this distinction, the Court of Appeals for the District of Columbia has utilized the “discretionary/ministerial” dichotomy employed by the Federal Tort Claims Act (“FTCA”).[8] See, e.g., Sanders v. WMATA 819 F.2d 1151, 1155 (D.C.Cir.1987).
Athough these two tests — “governmental/proprietary” and “discretionary/ministerial” — are not coterminous, the discretionary acts of public officials are recognized as being within a “subset *207 of governmental functions.” Id. at 1155 n. 9. In essence, all “discretionary” activities of a governmental entity under the FTCA constitute “governmental” activities within the meaning of the “governmental/proprietary” test. Therefore, the legal principles developed under the FTCA are a useful analytical tool for identifying the scope of the METRO’S immunity.
The Supreme Court long ago characterized the FTCA as distinguishing between “acts of a governmental nature or function,” which remain immune, and ministerial functions resulting in “ordinary common-law torts,” as to which the FTCA has waived governmental immunity. Dalehite v. United States, 346 U.S. 15, 28, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Thirteen years after the Supreme Court’s decision in Dalehite enunciated the distinction between discretionary and ministerial functions, the Compact came into existence. The Compact “accepted the Dalehite conception” and, as the FTCA does for the federal government, provided that the METRO is not liable for torts occurring in the performance of a governmental function. Sanders, 819 F.2d at 1155. Because of the FTCA’s similarity to Section 80 in provisions and purpose, we agree with the Court of Appeals for the District of Columbia that it is appropriate for us to analogize the immunity aspects of the Compact to the principles developed under the FTCA.[9] Applying this rationale, we will analyze the METRO’S immunity claim in this case on the basis of the FTCA’s legal principles.
C.
Our sister circuit in the seat of Government, which often addresses issues on the METRO Compact, has developed two alternate tests to assist in the identification of “governmental” functions under the Compact. Burkhart v. WMATA, 112 F.3d 1207, 1216 (D.C.Cir.1997). First, that court has recognized that if the METRO is engaged in a quintessential governmental function, its activities fall within the scope of its immunity. Id. If the METRO is not engaged in such a governmental function, however, a court must proceed to the second inquiry, and it must determine whether the challenged activity is discretionary or ministerial, the dichotomy employed by the FTCA. Id.
If the challenged activity is discretionary in nature, it falls within what has long been called the “discretionary function exception.” [10] Coates v. United States, 181 F.2d 816, 817 (8th Cir.1950). Under the discretionary function exception, the METRO is immune from any claim, “however negligently caused, that affect[s] the governmental functions.”[11] Dalehite, 346 *208 U.S. at 32, 73 S.Ct. 956. A ministerial activity of the government, on the other hand, “connotes the execution of policy as distinct from its formulation,” Giggs v. WMATA, 232 F.3d 917, 921 (D.C.Cir.2000), and such activities are not accorded immunity protection.
Most significantly in the context of this case, the Supreme Court, in 1991, made clear in United States v. Gaubert that discretionary acts deserving of immunity are not limited to policymaking or planning decisions; day-to-day management can also involve discretionary choices grounded in regulatory policy. 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). It is now settled that the day-to-day operational decisions of government are entitled to immunity under the FTCA so long as the choices are “susceptible to policy analysis.” Id. at 325, 111 S.Ct. 1267.
In order to determine whether an act or omission is a discretionary one — and therefore immune — we first assess whether an official or employee exercised “due care in carrying out statutes or regulations whether valid or not.” Dalehite, 346 U.S. at 33, 73 S.Ct. 956. As the Supreme Court has framed it, “conduct cannot be discretionary unless it involves an element of judgment or choice.” Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). And the analysis does not end there, for even if “the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield,” that is, decisions “grounded in social, economic, and political policy.” Id. at 537, 108 S.Ct. 1954; Dalehite, 346 U.S. at 36, 73 S.Ct. 956 (“Where there is room for policy judgment and decision there is discretion.”).
When a public employee makes a discretionary judgment in performing governmental duties, that judgment is entitled to immunity from liability “whether or not the discretion involved be abused.” Dale-hite, 346 U.S. at 33, 73 S.Ct. 956; see also Souders v. WMATA, 48 F.3d 546, 550 (D.C.Cir.1995) (“[T]he hard fact remains that insulating policy determinations, good and bad, is the raison d’etre of the discretionary function exception.”). As a reviewing court, we are not to inquire whether policy considerations were actually contemplated in making a decision. On the contrary, “a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy.” Baum v. United States, 986 F.2d 716, 720-21 (4th Cir.1993). If a governmental decision is susceptible to policy analysis and if, as Justice White stated, it is “grounded in the social, economic, or political goals of the statute and regulations,” that decision is entitled to immunity protection. Gaubert, 499 U.S. at 323, 111 S.Ct. 1267.
III.
Given this framework, we turn to the theories of negligence asserted against the METRO by Smith. See supra at 204. Because there are no issues of material fact bearing on the immunity claim óf the METRO in this case, we will apply the legal principles enunciated above, particularly the Court’s explication of the discretionary function exception in United States v. Gaubert, and assess whether, and to what extent, the METRO’S immunity claim must be recognized.
A.
Faced with what plainly constituted an emergency situation at the Bethesda station on July 20, 1998, the METRO determined that it should shut down Esca *209 lator One and utilize it as a stationary walker.[12] There being no statutory or regulatory mandate specifically governing the METRO’S actions in response to that situation, the METRO personnel at the Bethesda station were forced to make difficult choices. For example, with two of their three escalators out of service, they could (a) stop Escalator One and allow METRO patrons to both enter and exit the Bethesda station by using it as a stationary walker, or (b) operate Escalator One up or down, compelling all patrons moving in the other direction to use the elevator.[13]
There were potential economic and political costs to the METRO in choosing between such unattractive resolutions of its problem. For instance, its decision, however made, might well have resulted in public outrage, adverse media coverage, or political fallout. A decision to permit entering and .exiting METRO passengers to choose between walking on a stationary escalator or riding an elevator, rather than compelling the passengers moving in one direction to use the elevator, is plainly a decision “susceptible to policy judgment,” and it involves the “exercise of ‘political, social, or economic judgment.’ ” Cope v. Scott, 45 F.3d 445, 448 (D.C.Cir.1995) (quoting Gaubert, 499 U.S. at 325, 111 S.Ct. 1267); Baum v. United States, 986 F.2d 716, 721 (4th Cir.1993) (noting that discretionary decision is “one which we would expect inherently to be grounded in considerations of policy,” and is subject to “well-established presumption that public officials have properly discharged their official duties”). Indeed, the choices presented with respect to operations at the Bethesda station on July 20, 1998, implicated the METRO’S mission- — public transportation — and its ability to fulfill that mission in a safe and efficient manner. In sum, the choices confronting the METRO at Bethesda on July 20 involved, as the Court of Appeals for the District of Columbia astutely put it, “not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency.” Cope, 45 F.3d at 450 (quoting Sami v. United States, 617 F.2d 755, 766 (D.C.Cir.1979)).
The METRO officials at the Bethesda station on July 20, 1998, acted precisely as they were bound to act. They responded to the situation in a manner that implicated both their mission and public policy, and they decided to shut down Escalator One :and use it as a stationary walker. This governmental decision was plainly of the discretionary variety, and it is entitled to be accorded immunity protection.
B.
The METRO’S decision not to reassemble Escalator Three for use during rush hour on July 20, 1998, is also a governmental decision shielded by the discretionary function exception. That decision is “susceptible to policy analysis,” Gaubert, *210 499 U.S. at 325, 111 S.Ct. 1267, and it involved the exercise of economic policy judgment. Id. at 323, 111 S.Ct. 1267. There being no specific statutory or regulatory mandate for the METRO to reassemble Escalator Three, the potential choices implicated the ecopolicy of the METRO, i.e., whether it was more cost-effective to reassemble Escalator Three pending repair, or whether to wait until replacement parts arrived. Even if this decision had been incorrect, and even if it had constituted an abuse of discretion, it is, under the circumstances, deserving of immunity protection. Dalehite v. United States, 346 U.S. 15, 33, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).
C.
In the face of the situation at the Bethesda station on July 20, 1998, the METRO is also immune for its alleged failure to properly warn its Bethesda patrons of the inoperative status of Escalators Two and Three. Rosebush v. United States, 119 F.3d 438, 443 (6th Cir.1997) (“Decisions concerning the proper response to hazards are protected from tort liability by the discretionary function exception.”); see also Williams v. United States, 50 F.3d 299, 310 (4th Cir.1995). In this connection, we assess only the METRO’S asserted failure to warn Smith of the emergency situation on July 20, i.e., its failure to post temporary signs or personnel at the Bethesda station advising its patrons of the inoperative escalators and the location of the elevator.
As with its decisions on the utilization of Escalator One as a stationary walker and to delay reassembly of Escalator Three pending the arrival of replacement parts, no specific statute or regulation mandated any certain course of action by the METRO. Importantly, any hazardous condition present on that occasion was obvious, and where “the danger is not hidden, there is no duty to warn.” Rich v. United States, 119 F.3d 447, 452 (6th Cir.1997). For example, the long line of patrons waiting to use the elevator at the Bethesda station indicated both where it was located and that it was functional. And even after Smith’s arrival at the Bethesda station, when he became aware of any existing hazard, he had other available options. He could have waited for the elevator, or he could have decided to board another METRO train and depart the station. The METRO is entitled to be accorded immunity from a negligence claim in this situation, because, as the Sixth Circuit has held, “[a]ny duty to warn of this open and obvious hazard is discretionary and exempt from an action in tort.” Id.
D.
In its Opinion, the district court ruled in favor of the METRO on Smith’s fourth theory of negligence, i.e., the failure of its signage and illumination to comply with the requirements of the ANSI Code. See supra at 204. The court concluded that the METRO is immune from any theory of negligence based on the assertion that its permanent signage and illumination failed to comply with the law, because the METRO is immune from challenges to the design of its stations.[14] 133 F.Supp.2d at 406 *211 n. 2. As a result of this ruling by the district court, the theory of design defect is not before us in this appeal.
E.
Finally, Smith contends that the METRO negligently failed to repair and maintain Escalators Two and Three at the Bethesda station, and that such failure proximately caused his death. In addressing this contention, we first observe that the issue of whether this negligence -theory is properly on appeal is somewhat problematic. In its Opinion, the district court broadly observed that there was a lack of proximate cause between the “statutory violations” and Smith’s heart attack.' Specifically, it determined that “[pjlaintiffs have not sustained their burden to show that the injury suffered by their son was of the kind contemplated by the legislature in adopting the [ANSI] Code. Therefore, as a matter of law, Plaintiffs have not shown the alleged statutory violations proximately caused their son’s death.” 133 F.Supp.2d at 404. This conclusion indicates that the court contemplated awarding summary judgment to the METRO, on the basis of lack of proximate cause, with respect to alleged violations of the ANSI Code.[15] If such was the case, then there would be nothing for us to address on interlocutory appeal of this negligence theory, because the METRO would have already prevailed on the merits. However, the court also observed that “the heart of Plaintiffs complaint is the failure to repair and maintain the primary means of ingress and egress from the station’s premises,” and that “this conduct does not fall within the scope of [METRO’S] immunity.” 133 F.Supp.2d at 407. In the context of these conflicting statements, the breadth of the court’s assessment of proximate cause is sufficiently vague to warrant that its scope should be defined by the district court.
For the purposes of the METRO’S interlocutory appeal, however, we possess jurisdiction only with respect to its claim of immunity. To the extent that the METRO’S repair and maintenance of Escalators Two and Three contravened applicable requirements of the ANSI Code, such repair and maintenance would not involve “an element of judgment or choice,” and it would therefore fall outside the discretionary function exception.[16] Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954. In such a circumstance, the METRO would not be entitled to immunity on this theory of negligence.
On remand, the district court should first accord the METRO the immunity to which it is entitled. Then, if necessary, it can decide whether Smith can make a prima facie showing of negligent repair and maintenance, and it can also assess whether there is a sufficient proximate cause nexus between such a showing and Smith’s death. The district court should then determine whether anything is left of this case.
*212 IV.
In summary, we conclude that the METRO is entitled to be accorded immunity under the discretionary function exception for its decisions at the Bethesda station on July 20, 1998:(1) to brake Escalator One and utilize it as a stationary walker; (2) to leave Escalator Three disassembled; and (3) to provide no specific warning to its patrons of the situation at the station. We therefore vacate the partial denial of the METRO’S claim of immunity, and we remand ■ for any further proceedings that may be appropriate.

VACATED AND REMANDED.

. A "stationary walker” is an escalator at a METRO station that has been braked and stopped in a stationary position and has been placed in use as a stairway. Patrons of the METRO are then permitted to walk up or down the stationary walker.

. At the time of his death, Smith was a 37-year-old obese male. Although apparently unaware of his condition, he suffered from severe coronary atherosclerosis, with a 70% to 90% blockage of the arteries surrounding his heart. In 1994, Smith was diagnosed with high cholesterol, but he had rejected his doctor’s recommendations for ameliorating this condition.

. We refer in this opinion to the plaintiffs collectively, including the decedent, as "Smith.”

.The American National Standards Institute (ANSI) promulgates a Safety Code for Elevators and Escalators. The ANSI Code is developed by the American Society of Mechanical Engineers, and it is published after approval by ANSI as an American National Standard. Maryland law requires that all escalators be maintained in accordance with, the ANSI Code. Md. Ann.Code art. 89, § 49B(d) (1998 Repl.VoL).

. Pursuant to Rule 12(b)(1), the defense of "lack of jurisdiction over the subject matter” may be asserted by motion at the option of the pleader, rather than requiring it to be asserted in the responsive pleading. Only a motion under Rule 12(b)(6) will be treated as one for summary judgment, and then only if “matters outside the pleading are presented to and not excluded by the court.”

. The parties to the Compact — Maryland, Virginia, and the District of Columbia — have each adopted Section 80, providing that:
The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.
Md.Code Ann. Trans. § 10-204(80) (2000); Va.Code Ann. § 56-529, 530 (2001); D.C.Code Ann. § 9-1107.01 (2001) (emphasis added).

. The Supreme Court has determined, in a number of contexts, that the previously recognized "distinction between 'governmental' and 'proprietary' functions was untenable and must be abandoned.” Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 542, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (citing cases). To illustrate the intended difference, however, operation of a police force is a quintessential "governmental function,” Morris, 781 F.2d at 220, and the "design and planning of a transportation system” also falls into the "governmental” categoiy. McKethean v. WMATA, 588 A.2d 708, 713-14 (D.C.Ct.App.1991). The provision of mass transportation by a public body, however, is generally recognized as a "proprietary” function. Qasim v. WMATA, 455 A.2d 904, 906 (D.C.1983).

.Pursuant to the FTCA, the Government has not waived its immunity as to
[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
28 U.S.C. § 2680 (emphasis added).

. We recently recognized that a proper consideration in construing the Compact is the maintenance of consistency between the legal interpretations of the "two federal circuits most likely to hear cases in which [METRO] is a party,” i.e., this Court and the Court of Appeals for the District of Columbia. Lizzi v. Alexander, 255 F.3d 128, 134 (4th Cir.2001).

. The term "discretionary function exception,” standing alone, is some-what misleading. It constitutes an exception to the waiver of immunity contained in the FTCA, meaning that if an activity of the METRO falls within the exception, it is entitled to be accorded governmental immunity. See Williams v. United States, 50 F.3d 299, 304-05 (4th Cir.1995).

. A prime example of negligence not immune and for which the government is liable is “negligence in the operation of vehicles.” Dalehite, 346 U.S. at 29, 73 S.Ct. 956; see also United States v. Gaubert, 499 U.S. 315, 325 n. 7, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (“Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.”).

. Regarding the first negligence theory, i.e., the METRO’S decision to shut down Escalator One in order to use it as a stationary walker, the district court's statements seem unclear. On the one hand, it recognized that the ANSI Code did not prohibit the usage of the escalator as a walker; on the other hand, it also stated that "the opinion of the Chief Inspector as to the interpretation of the elevator and safety code provides a sufficient basis for establishing a statutory violation." 133 F.Supp.2d at 404. Regardless, the Opinion contemplates that the use of Escalator One as a walker is part of the outstanding and viable case against the METRO. As such, we must construe this negligence theory as having been resolved against the METRO and as being a viable issue on appeal.

. There may have been other options available- to the METRO. For example, it could have shut down the Bethesda station entirely.

. While Smith also maintained that the permanent signage and illumination at the Bethesda station contravened the ANSI Code, the district court examined this contention carefully and ruled against him. It concluded that there was an insufficient nexus between, on the one hand, the harms the ANSI Code was designed to prevent and, on the other, any harm suffered by Smith. Specifically, the court determined that "as a matter of law, Plaintiffs have not shown the alleged violations proximately caused their son's death, and an action for damages may not lie based *211 upon the theory of a statutory violation.” 133 F.Supp.2d at 404.

. Indeed, Smith's counsel stated at oral argument that if the METRO’S decision to shut down Escalator One on July 20, 1998, is entitled to immunity, this is “the end to this case.”

. Although the METRO is not generally governed by state law, the Compact requires that it comply with the “laws, rules, regulations and orders relating to inspection of equipment and facilities, safety and testing.” Md. Code Ann. Trans. § 10-204 ¶ 77 (1999). Violation of an applicable ANSI standard is evidence of negligence in Maryland. Kent Village Assocs. Joint Venture v. Smith, 104 Md. App. 507, 657 A.2d 330, 337 (1995).